[No. 38626.    En Banc.    October 26, 1967.]

THE STATE OF WASHINGTON, *Respondent*, v. REINHART HENRY NELSON, *Appellant*.*

*Reported in 432 P.2d 857.

270

*Schumacher & Charette,* by *John W. Schumacher,* for appellant (appointed counsel for appeal).

*L. Edward Brown,* for respondent.

DONWORTH, J.—Reinhart Henry Nelson, John Thomas Patrick, Jr., and Alberta Russell Burns were jointly charged with murder in the first degree in that they,

> . . . while engaged in the commission of or in withdrawing from the scene of the crimes of Attempted Burglary in the First Degree, or Attempted Robbery, did . . . shoot . . . into the body of . . . Dan Damitio, . . . then and there mortally wounding the said Dan Damitio . . . .

The amended information charged that the murder was committed at Damitio's home in Grays Harbor County on February 2, 1963.

Patrick pleaded guilty to the reduced charge of murder in the second degree and received a penitentiary sentence. Mrs. Burns entered a plea of guilty to a reduced charge of burglary in the second degree and received a probationary sentence. At his first trial Nelson, who pleaded not guilty, was tried and convicted. He was sentenced to life imprisonment. Upon appeal, that judgment and sentence was reversed by this court and he was granted a new trial because of the admission in evidence against Nelson of the testimony of A. M. Gallagher, undersheriff of Grays Harbor County, relating to the details of a purported oral confession of Patrick, made out of the presence of Nelson. *State v. Nelson,* 65 Wn.2d 189, 396 P.2d 540 (1964).

It is stated in appellant's brief in the present case that a second trial was commenced in Grays Harbor County on April 7, 1965, which terminated 2 days later in a mistrial ordered during presentation of the state's case. By stipulation, the cause was then transferred to Thurston County for the third trial, which was held June 28, 29, and 30, 1965, before visiting Judge Warner Poyhonen sitting with a jury. That trial resulted in appellant's second conviction of murder in the first degree and the imposition of a sentence of life imprisonment. This appeal is taken from that judgment and sentence.

Three assignments of error are stated by appellant as follows:

I.  The trial court erred in permitting the prosecution to require John Thomas Patrick to claim his privilege against self-incrimination in the presence of the jury.
II.  The trial court erred in admitting the opinion of R. F. Simmons as an expert.
III.  The trial court erred in refusing to dismiss the state's case on the grounds of insufficiency of evidence.

We shall discuss these assignments of error in inverse order for reasons that will become apparent.

### INSUFFICIENCY OF THE EVIDENCE

In instruction No. 15, the trial court properly instructed the jury:

The fact that Daniel E. Damitio died as a result of a gunshot wound suffered on or about February 2, 1963, if you find this to be a fact, does not of itself prove, or tend to prove, in any way that the defendant committed any crime, nor does it support any degree of probability that the defendant did so.

That the said Daniel E. Damitio was killed in a criminal manner, and that the defendant committed this crime, are two independent facts, both of which the State must prove beyond a reasonable doubt. If the State should fail to prove either beyond a reasonable doubt, your verdict must be for the defendant.

Exclusive of the disputed testimony of Mr. Simmons, the state's evidence tended to show the following:

Dan Damitio was the owner and operator of a grocery store and gas station located across the highway from his home in Cedarville. His body was discovered in his home on the morning of February 3, 1963, by two friends, Mr. Warness and Mr. Golman. There was a great deal of blood in various rooms of the house. The body, shot through the left arm, was lying on the floor of the bedroom. Dr. Charles Pollock, the county coroner, testified that there was what appeared to him to be a powder burn on the forearm of the victim. Dan Damitio died from loss of blood. According to the testimony of Dr. Pollock, the wound in Damitio's arm, from which he bled to death, was caused by a bullet striking his upper arm, producing disruption and breaking the blood vessels. Dr. Pollock found one or more fragmented metalic particles in the arm.

There was an apparent attempt by Damitio to write a will sometime after he was shot. Dr. Pollock testified to having seen the writing on a paper on the kitchen table, beneath which there was an accumulation of blood.

On the fireplace hearth, officers found a Smith & Wessen .38 special revolver which belonged to Damitio. The gun contained two loaded and four spent cartridges. There was one new bullet hole through the front door of the house, and two through an exterior porch wall. There was blood on the front porch. The slug which passed through the front door was recovered and was found to be from the .38 pistol.

There were no signs of forced entry through either the front or back door. Both doors were closed and locked when witnesses Warness and Golman arrived at the scene. A front window was broken out, however, and a stick of wood was found lying on the davenport inside the window. Mr. Warness entered the house through that window after removing two pieces of broken glass.

Law enforcement officers, utilizing a metal detector obtained from Fort Lewis, searched the premises thoroughly for a rifle casing or slug, but found none. Hence, except for the opinion testimony of Mr. Simmons, a former sheriff (to

be discussed later), there was no direct evidence that any weapon other than the .38 special belonging to the deceased was fired at the scene.

The foregoing evidence, taken together with Mr. Simmons' opinion testimony, constitutes the entire state's case relating to the corpus delicti, which is the first element of the crime to be proven beyond a reasonable doubt (see instruction No. 15, *supra*), to wit, that Dan Damitio was killed in a criminal manner.

The only direct evidence connecting appellant with the death of Damitio was the testimony of Mrs. Burns, an alleged accomplice. Her testimony, if believed by the jury, would establish the following:

She and Patrick drove Patrick's station wagon north from Aberdeen on February 2, 1963, stopping for gas in Hoquiam. They subsequently made stops at the Wigwam tavern and at the Ox Bow. They met appellant at a tavern in Amanda Park at about 4 or 4:30 p.m. There, the three had a few drinks and played shuffleboard. Nelson and Patrick left for about five minutes, but Mrs. Burns testified that she did not know where they went. The trio left the tavern in Amanda Park shortly after Patrick and Nelson returned, and they went to Nelson's cabin near Lake Quinault. Patrick and Nelson went into the cabin, and returned a few minutes later with a rifle, placing it behind the front seat of the car on the floor. Mrs. Burns also testified that there had already been a rifle there, one given Patrick by her father at some earlier time. She said she had asked the two what the rifle was for, and one of them replied that "something was up."

The three then set out for Aberdeen, stopping on the way at the Ox Bow for coffee, and at the Midway tavern on the boundary between Aberdeen and Hoquiam.

When they left that tavern, they headed for Montesano, which is 10 miles east of Aberdeen. Patrick asked Mrs. Burns if she had some nylon stockings, and she replied that she did not. Patrick then stopped in Montesano and sent Mrs. Burns into the Safeway store to purchase two pairs of

nylons. She returned to the car after making the purchase, and Patrick then drove the car toward Elma. They passed on through Elma toward Cedarville.

She testified that they did not continue on the main road through Cedarville, but turned off onto a side road when they noticed a car with no lights on in a garage. They went down the road about a mile, and stopped at a service station. Mrs. Burns testified that, after they had stopped, Patrick and Nelson discussed something about which would be the best way to go in.

At this point, Mrs. Burns took the nylon stockings she had purchased in Montesano out of the glove compartment and placed them on her lap. She stated that Nelson took one, stretched it as if to put it over his head, but that neither of the men wore the stockings when they left the car.

Patrick and Nelson got out of the car, Patrick telling Mrs. Burns to keep the motor going, and that, if any car came along, she was to drive until she passed the car and then turn around and come back. A car did come along once while the two men were out of the car and Mrs. Burns obeyed Patrick's instructions.

She further testified that neither of the men took anything with them when they first left the car. Patrick returned to the car after a time and took a flashlight. According to her testimony, to her knowledge, neither of the rifles lying on the floor behind the seat in which she was sitting was taken from the car. She also stated that she could not tell which way Patrick and Nelson went after they left the car, because it was dark and raining outside.

Mrs. Burns testified that there were no lights on either in the house across the street from the service station (Damitio's house) or in the service station itself. Mr. Golman, who heard two shots from the direction of Damitio's house, testified that the lights in the house went on just after the shots were fired.

Both Patrick and Nelson returned to the car, Nelson saying, "I am shot." Patrick later admitted to Mrs. Burns

that he, too, had been shot, and she then took the wheel of the car and drove the rest of the way to St. Joseph Hospital in Aberdeen.

In the trial court's instruction No. 20, the jury was told that:

You should consider the testimony of an alleged accomplice only with great care and caution. You must subject such testimony to careful consideration in light of other evidence in the case. You should not find the defendant guilty on the basis of such testimony alone unless, after a careful examination of it, you are satisfied beyond all reasonable doubt of its truth.

The evidence outlined thus far, which, except for the testimony of one man, constitutes the state's case in its entirety, is not sufficient to support the conviction of Nelson. Giving full credibility to the evidence with all inferences to be properly drawn therefrom, it shows only that Damitio bled to death as a result of a gunshot wound in the left arm. Four shots were fired from his .38 pistol and only four bullets were accounted for at the scene of the death. Patrick, Nelson, and Mrs. Burns were at the scene of the alleged killing, according to Mrs. Burns' testimony. That testimony is the only evidence connecting appellant with the crime charged. There is lacking from the state's case thus far, proof of the essential causal connection between the death of Damitio and the criminal act or agency of another person. However, the additional evidence tending to prove that element, introduced by the state and discussed below, was sufficient to take the case to the jury. Appellant's first assignment of error is without merit.

In order to establish that final element, that another gun (other than Damitio's own .38 revolver) had been fired, and that a bullet from that other gun caused the wound from which Damitio died, the state introduced the testimony of a former Grays Harbor County sheriff, Richard Simmons.

At the time of the trial, Mr. Simmons was director of the Washington State Safety Council. He had been sheriff of

Grays Harbor County for 14 years prior to the trial, and before that he had been a Washington state liquor inspector for 3 years. Guns were his avocation. He hunted large game, and possessed an extensive collection of firearms. His interest in guns and ammunition dated from 1935. He testified that he had written articles which were published in national publications in general circulation, and in law enforcement magazines and bulletins. His special interest was in "wildcat" cartridges and custom-built rifles. This was his first experience in testifying on the particular subject involved here. He did not claim to be a ballistics expert.

Mr. Simmons first testified as to the relative explosive and striking power of pistol bullets and rifle bullets. He then testified:

> Q. Dick, do you have an opinion whether or not that wound which you see there [in a photograph of Damitio's arm] had been inflicted from a bullet from that .38 special at close range? A. Do I have an opinion? Q. Yes. A. Yes, I do. Q. What is that opinion? A. It could not have been.

■ It is the established rule in this state that the determination of qualifications of an expert witness is a matter within the sound discretion of the trial court. *State v. Tatum*, 58 Wn.2d 73, 360 P.2d 754 (1961). The trial court did not abuse its discretion in this case. Appellant's second assignment of error is without merit.

We now turn to appellant's main assignment of error, *i.e.* that it was error to permit the prosecution to require the accomplice, Patrick, to claim his privilege against self-incrimination in the presence of the jury.

### Assignment of Error No. 1

We note first that the defense, in the absence of the jury, prior to Patrick's being called to the witness stand, called to the court's attention that Patrick had indicated an intention to claim his privilege against self-incrimination on all questions relating to the night in question. Mr. Schumacher, counsel for the defense, stated to the court:

[I]f there is any doubt about what this man is going to testify to, I can ask the Court to call him in the absence of the jury and let the prosecutor ask him questions. This is a very critical thing in this case and I don't want the prosecutor getting their point to the jury by unanswered questions.

A motion was made that:

[T]he State not be allowed to call John Thomas Patrick and wring from him the protection of the Fifth Amendment, . . . .

The prosecutor admitted that Patrick had told him that he would claim his Fifth-Amendment privilege. The prosecutor told the court:

I said, "Are you going to claim that on all questions—everything we ask?" He said, "I don't know—have to wait and see what the questions are."

It is apparent that there was no equivocation on Patrick's part as to his intention to claim the privilege to all questions relating to the events of the night in question. He had done so at Nelson's first trial. We also note in passing that Patrick's claim of the privilege against self-incrimination was proper, although he had pleaded guilty to the charge of second-degree murder, since he was subject to possible prosecution on an attempted burglary or robbery charge. We believe that the state had reason to believe, before calling Patrick as a witness, that he would claim his privilege to all questions relating to the events of the night in question while he was on the witness stand.

It is true that Patrick did answer some of the questions put to him on the stand such as his name; his relationship to George Patrick, a deputy sheriff; his acquaintanceship with Alberta Burns; his ownership of an automobile; and he admitted that he knew appellant Nelson and had visited him on occasion; denied that he (Patrick) owned a pistol; and stated the distance from Aberdeen to Montesano. However, no answer was given to any question relating to the alleged crime. To each of the 28 questions asked regarding the events of February 2, 1963, Patrick asserted his Fifth-Amendment privilege.

The questions objected to by appellant, and to which Patrick claimed his privilege not to answer, were as follows:

Q. Directing your attention, Mr. Patrick, to the night of February 2, 1963, I will ask you if you had occasion to see your brother George?

Q. Were you at St. Joseph's Hospital on the night of February 2, 1963?

Q. Did you obtain a gun at any time from her [Alberta Burns] father?

Q. Did you have occasion, Tom, to go to Amanda Park that day? [February 2, 1963.]

Q. Did you drive it [the car] to Amanda Park?

Q. Did you have occasion to stop at the Ox Bow Tavern on February 2nd, 1963?

Q. On February 2nd,—strike that. You recall whether or not on that date you ever went to Montesano?

Q. Well, Mr. Patrick, I will ask you whether or not on February 2, 1963, whether or not you shot and killed Mr. Dan Damitio?[1]

Q. Well, Tom, were you out in the Cedarville area on the night of February 2, 1963?

Q. Prior to February 2, 1963, had you ever been out to the Cedarville area?

Q. Did you know where Dan Damitio lived?

Q. Well, Mr. Patrick, I will ask you whether or not on February 2, 1963, in the evening of that day, you were at a Dan Damitio's house and the Cedarville store in company with Alberta Burns and Reinhart Henry Nelson?

Q. Did you have occasion to see Mr. Nelson at any time on February 2, 1963?

Q. Do you know whether Reinhart Henry Nelson and Alberta Burns were out in this Cedarville area on the night of February 2, 1963?

Q. Do you know whether or not or do you know if Dan Damitio's house had a telephone?

Q. Then I take it you didn't have a pistol in your car on February 2, 1963?

[1]Contention was made here by the prosecution that Patrick could not claim the privilege to the question. The court, in the presence of the jury, noted the contempt in the record. The court later withdrew that ruling, and so instructed the jury.

Q. Would you tell us what all you had in that station wagon on February 2, 1963?

Q. I will ask you if on February 2, 1963, you did go in the basement of Dan Damitio's home at Cedarville.

Q. You know whether or not Reinhart Nelson went in?

Q. On February 2, 1963, did you have occasion or did you go to Nelson's cabin in Amanda Park?

Q. On that date, did Reinhart Henry Nelson bring a gun of some kind out to your car?

Q. Well, did you ever see him [Nelson] with a pistol on February 2, 1963,—revolver?

Q. Did you ever have any nylon stockings in your car on that day?

Q. Did Alberta Burns give any stockings, that date, that you know of,—

Q. Tom, I will ask you again whether or not on February 2, 1963 you shot and killed Dan Damitio?

Q. Tom, I don't remember asking you, but on February 2, 1963, did you consume any intoxicating liquor that day at all?

Q. Did you play any shuffleboard that day?

Q. Did you receive any medical attention on February 2, 1963, Tom?

When this case was previously before this court (65 Wn.2d 189), we held that it was not reversible error for the trial court to permit the state to call Patrick to the stand when the prosecutor knew that Patrick would invoke the Fifth-Amendment privilege. However, in the present appeal, a greatly differing set of facts is presented.

█ We note first that reversible error is not invariably committed whenever a witness claims his privilege not to answer, but rather the courts will look to the surrounding circumstances in each case. *Namet v. United States*, 373 U. S. 179, 10 L. Ed. 2d 278, 83 Sup. Ct. 1151 (1963).

In *Namet, supra,* the appellant contended that reversible error was committed by the trial court when it permitted the state to question witnesses after it was known that they would claim their privilege against self-incrimination. The United States Supreme Court, in its analysis of the applica-

ble law, stressed two factors, each of which, it stated, suggested a distinct ground of error.

First, some courts have indicated that error may be based upon a concept of prosecutorial misconduct, when the Government makes a conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege. This seems to have been one of the principal reasons underlying the finding of reversible error in *United States v. Maloney, supra* [262 F.2d 535]. In that case, the prosecution admitted knowing that two of its key witnesses could validly invoke the privilege against self-incrimination and intended to do so. The prosecutor nevertheless called and questioned them. The court also found that the Government's closing argument attempted to make use of the adverse inferences from their refusals to testify. See also *United States v. Tucker,* 267 F.2d 212. A second theory seems to rest upon the conclusion that, in the circumstances of a given case, inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant. This theory seems also to have been present to some extent in the *Maloney* decision, where the court noted that the challenged inferences were the only corroboration for dubious and interested testimony by the Government's chief witness. 262 F.2d, at 536-537. (p. 186)

Noting that the witnesses had been asked only four questions to which they responded with a claim of the privilege, and that they had given extensive testimony material to the government's case, the court, in *Namet, supra,* noted that:

On the other hand, courts have failed to find reversible error when such episodes were "no more than minor lapses through a long trial." *United States v. Hiss,* 185 F.2d 822, 832 (C.A.2d Cir.).

The court then held, at 189:

We cannot find that these few lapses, when viewed in the context of the entire trial, amounted to planned or deliberate attempts by the Government to make capital out of witnesses' refusals to testify. . . .

Nor can we find that the few invocations of privilege by the Kahns were of such significance in the trial that

they constituted reversible error even in the absence of prosecutorial misconduct. The effect of these questions was minimized by the lengthy nonprivileged testimony which the Kahns gave. . . . the present case is not one . . . in which a witness' refusal to testify is the only source, or even the chief source, of the inference that the witness engaged in criminal activity with the defendant. In this case the few claims of testimonial privilege were at most cumulative support for an inference already well established by the nonprivileged portion of the witness' testimony.

We feel that the treatment of Patrick's claim of the privilege in the first trial of Nelson may be aptly characterized as a "minor lapse." Under the circumstances, the holding there does not control in the present appeal.

■ We note first that the state was aware that Patrick would claim his privilege as to all questions asked him concerning the events of the night of the alleged crime. He stated that intention to the attorney for appellant, who in turn informed the court and the state of that intention. The prosecutor admitted that Patrick had expressed the same intention to him, though perhaps less unequivocally. Further, the state was well aware that Patrick had claimed his privilege as to incriminating questions at Nelson's first trial.

In United States v. Tucker, 267 F.2d 212 (3d Cir. 1959), a case in which the government called to the stand a witness who had claimed his privilege at the former trial of the same case, and again received his Fifth-Amendment response to the same questions which had been propounded before, the court said, at 215:

There is no suggestion that the government had any reason to believe that at the second trial the witness would answer those questions he refused to answer at the first trial. In similar circumstances, two courts of appeals have already warned that a second interrogation, which has no apparent purpose but to invite invocation of the privilege against self incrimination, is improper and is likely to constitute reversible error. See United States v. Amadio, 7 Cir., 1954, 215 F.2d 605, 613; United States v. Five Cases, etc., 2 Cir., 1950, 179 F.2d 519, 523. On a third

trial of this indictment, the witness in question should not be interrogated about any matter to which the government has reason to believe he will interpose a proper plea of self incrimination. In our view an interrogating official himself gravely abuses the privilege against self incrimination when, believing a truthful answer will incriminate a witness, he nevertheless insists on asking the incriminating question with a view to eliciting a claim of privilege and thereby creating prejudice against the witness or some other party concerned.

Had there been a genuine doubt in the mind of the prosecutor that the witness, Patrick, would again claim his privilege as he contended he would, the wisest solution, it seems to us, was that suggested by appellant's attorney:

If there is any doubt about what this man is going to testify to, I can ask the Court to call him in the absence of the jury and let the prosecutor ask him questions. This is a very critical thing in this case and I don't want the prosecutor getting their point to the jury by unanswered questions.

As noted by the Fifth Circuit Court of Appeals in *San Fratello v. United States*, 340 F.2d 560, 565 (5th Cir. 1965):

There is nothing about the government's right to have a witness claim his privilege in response to specific questions while on the stand under oath that requires it to be done in the presence of the jury.

Another solution would have been to have discontinued the examination of this witness for the state once it became apparent that the witness did in fact intend to claim his privilege, as he had a right to do. This procedure met with our approval in the first trial of Nelson.

But, in the present case, neither solution was attempted. Instead, the prosecutor called Patrick to the stand, and, in the presence of the jury, asked 28 questions of Patrick outlining substantially in its entirety the state's theory of the case. As anticipated, Patrick claimed the privilege against self-incrimination to each of the questions.

We must further stress the fact that several of the questions asked Patrick by the prosecutor were not based on evidence presented in this trial, but were taken from Pat-

rick's alleged oral confession as related by undersheriff Gallagher in Nelson's first trial. It was precisely that testimony of Mr. Gallagher's, setting forth the details of Patrick's purported oral confession, that resulted in the reversal of Nelson's first conviction. *State v. Nelson, supra.* This rather transparent attempt by the state to get these inadmissible matters before the jury by way of inference cannot be approved.

Finally, this questioning of Patrick must be viewed against the background of the state's case as a whole. The only evidence tending to show that Dan Damitio died as the result of a wound caused by any bullet other than the one fired from his own gun was the opinion testimony of Mr. Simmons. The only direct evidence placing Nelson at the scene on the evening in question is the testimony of Mrs. Burns, an alleged accomplice, whose testimony seems to be that neither Patrick nor Nelson was armed when they left the car.

We noted in the opinion on the first appeal of this case, at 191, that:

[T]his confession [oral statements given to undersheriff Gallagher by Patrick] was the only intelligible account presented by the state of what happened on the evening of the shooting and of Nelson's participation therein.

The only substantial change in the evidence presented by the state was the substitution of the testimony of Mr. Simmons, who stated that Damitio's wound could *not* have been caused by a shot fired from his own .38 special, for the testimony of Dr. Charles P. Larson, a pathologist, according to whom it was "highly unlikely" that a bullet fired from a .38 special would cause such a wound.

In *Fletcher v. United States*, 332 F.2d 724 (D.C. Cir. 1964), a case substantially "on all fours" with the present case, the court stated, at 726, that:

Among the circumstances of the case at bar are the following features: (1) The Government knew, and the court also knew, that Anderson would refuse to testify upon his claim of the privilege under the Fifth Amendment. (2) The prosecutor asked a series of questions,

which depicted the alleged offense in its entirety. The questions were not a "few lapses" as referred to in *Namet*. (3) The testimony sought from Anderson was the principal source of support for the testimony of the Government's only witness, the cab driver, and thus, if the jury drew inferences from Anderson's refusal to answer, those inferences would have served that purpose. (4) Anderson's refusals to testify were not incidents in the course of other admissible testimony given by him. He gave no other testimony. Save for the formalities, such as name, age and address, his refusals constituted the whole of his participation in the case. (5) Anderson's refusals were not mere incidents in a long trial. . . . Anderson's part in it was a major feature of the proceeding.

The trial court, in *Fletcher*, instructed the jury that no inferences or presumptions were to be drawn from Anderson's refusal to testify, but the appellate court held that such an instruction was ineffective since the trial court added to it that the exercise of the right by Anderson "does not mean by itself, of course, that this defendant is guilty." The appellate court felt that such a statement might have led the jury to believe that they could consider Anderson's refusals along with other evidence as proof.

The only instruction given to the jury in the instant case bearing on this matter was instruction No. 6, which stated:

The defendant is to be tried only on the evidence which is before the jury, and not on suspicions that may have been excited by questions of counsel, answers to which were not permitted, or answers given by witnesses which have been stricken and which you have been instructed to disregard.

We think that this instruction was wholly ineffective to dispel inferences that could have been improperly drawn by the jury from Patrick's claim of his privilege.

This rule, seemingly well established, gained the status of a constitutional right with the decision in *Douglas v. Alabama*, 380 U.S. 415, 13 L. Ed. 2d 934, 85 Sup. Ct. 1074 (1965). In that case, the prosecutor read from a paper, purporting to be a written confession of the witness who was an accomplice of the defendant in the crime charged.

At intervals, the prosecutor would pause and ask the witness "did you say that?" To each such question, the witness would refuse to answer on the grounds of the Fifth Amendment. The Supreme Court said:

This case cannot be characterized as one where the prejudice in the denial of the right of cross-examination constituted a mere minor lapse. The alleged statements clearly bore on a fundamental part of the State's case against petitioner. The circumstances are therefore such that "inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant." *Namet v. United States,* 373 U. S. 179, 187. See also *Fletcher v. United States,* 118 U. S. App. D.C. 137, 332 F.2d 724 (1964). (p. 420)

It was held that the intentional asking of questions by the state of the witness who continually claimed the privilege against self-incrimination constituted a denial of the defendant's right to confrontation under the sixth amendment to the United States Constitution. See, also, *Pointer v. Texas,* 380 U.S. 400, 13 L. Ed. 2d 923, 85 Sup. Ct. 1065 (1965).

The conduct of the prosecutor in placing Patrick on the stand, knowing that Patrick intended to claim his privilege against self-incrimination to questions relating to the alleged crime, and seeking to get the details of Patrick's purported confession before the jury by way of impermissible inferences drawn from the witness' refusal to answer the questions propounded, constituted a denial of Nelson's right to confrontation under the Sixth Amendment. The inferences added "critical weight to the prosecution's case in a form not subject to cross-examination," and were thus unfairly prejudicial to appellant.

Nelson's conviction of first-degree murder, and the judgment and sentence based thereon are, therefore, reversed with directions to grant him a new trial.

WEAVER, J., and BARNETT, J. Pro Tem., concur.

HAMILTON, J., concurs in the result.

HILL, J. (concurring)—I concur in the result of the majority opinion.

Upon the prior appeal of this case (*State v. Nelson*, 65 Wn.2d 189, 396 P.2d 540 (1964) ), this court stated that the trial court did not err in permitting Patrick to be called as a witness by the state even though it was known that Patrick would invoke the Fifth Amendment. It was noted that there were questions which Patrick could have been required to answer without incriminating himself, and that the Fifth Amendment was not a blanket which precludes all questioning, but is rather a privilege which must be claimed.

This is still the law. However, upon retrial of the case, the state made the shield of protection granted by the Fifth Amendment to the witness a weapon for getting its case before the jury by means of impermissible inferences. The use of such a prejudicial trial tactic amounts to reversible error. I, therefore, concur in the granting of a new trial.

However, I want to make it clear that I am, by my concurrence, not committing myself to the same conclusion under the same circumstances should this case again reach this court. The first trial was in 1963; the second trial (and this appeal is from the judgment and sentence in that trial) was in 1965. Patrick's refusal to testify at both of these trials was justified by the possibility of his prosecution for the burglary or robbery during which the fatal shooting of Dan Damitio occurred on February 2, 1963. He pled guilty to the murder of Damitio (second degree) and is presently serving a term at the penitentiary for that offense; certainly any other offense in which he may have been particeps criminis on February 2, 1963, is now barred by the 3-year statute of limitations (RCW 10.01.020). He no longer has any need of the protection of the Fifth Amendment.

The state, on another trial, would have no reason to believe that Patrick would invoke the Fifth Amendment. A witness cannot invoke the Fifth Amendment merely to protect another from punishment. *Marcus v. United States*, 310

F.2d 143 (1962); *Rogers v. United States,* 340 U.S. 367, 95 L. Ed. 344, 71 Sup. Ct. 438, 19 A.L.R.2d 378 (1951).

The admonition given by the court in *United States v. Tucker,* 267 F.2d 212, 215 (1959) (quoted in the majority opinion) on how to interrogate the witness on a third trial in that case, has no application to a third trial of the present case.

HALE, J. (dissenting)—I dissent. Does the law view with such delicacy the sensibilities of a convicted murderer that the prosecuting attorney is forbidden even to examine him as a witness when he believes that the witness, although intending to claim the Fifth Amendment, may give vital evidence? If so, the criminal, in the eyes of the law, now occupies a status superior to that of the millions of hard-working, honest, respectable people who support and sustain this democracy and maintain its courts. The majority grants a new trial, it seems to me, for reasons which, if carried into the mainstream of criminal law, will effectively weaken the administration of justice.

The majority opinion seems to be based on the idea that two things, appearing together, warrant a new trial: (1) a weak case against the defendant, concurring with (2) a persistently inflammatory examination of a witness who had indicated his intent under the Fifth Amendment to refuse answering.

In my view, however, the case against Nelson was (1) not weak but strong indeed, and based on clear proof of cogent circumstances showing his guilt, and (2) the prosecuting attorney not only committed no error in examining Patrick but, further, had a sworn duty under the law to put to Patrick the very questions upon which the new trial has been granted.

Besides the evidence delineated in the majority opinion, we have photographs showing a heavy chunk of wood lying on a davenport in the living room in such a position as to indicate it had been pitched through the front room window from the outside. To do so, someone had to be standing

within the enclosed area of the front porch. The pictures also illustrate copious blood stains on and near the front door and door sill, indicating the door to have been touched during the evening by one who was bleeding heavily. These facts, coincident with the massive wound on the victim's forearm and elbow, clearly are compatible with the state's theory of the case, and enable a jury finding that Damitio had been shot at close range by a missile from a high velocity weapon, while standing either on the front porch or within view of the window. That the investigating officers found no empty rifle shell casing at the scene does not prove that none was fired, but rather that no casing was ejected from the weapon's chamber—a strong likelihood in the prosecutor's mind from statements made by Patrick prior to Nelson's first trial.

Thus, even before we come to the testimony of Alberta Burns, we have strong proof of circumstances showing that Damitio was murdered. Alberta Burns' testimony, corroborated as it was in some degree by Patrick, despite his refusal to answer 28 questions, made a strong case for the jury that Nelson participated in the crime. Although we ruled Patrick's oral confession inadmissible against Nelson in the first trial (*State v. Nelson,* 65 Wn.2d 189, 396 P.2d 540 (1964)), nevertheless, the prosecuting attorney was entitled to use this information when developing his theory of a murder—a homicide committed by means of a rifle. Accordingly, the state called Richard Simmons, an expert in firearms. Mr. Simmons' competence to testify as an expert is not in doubt here for the qualifications of an expert are primarily for the trial court (*State v. Kennedy,* 19 Wn.2d 152, 142 P.2d 247 (1943) ), and a qualified expert may express an opinion on an ultimate fact. *State v. Hedin,* 67 Wn.2d 542, 408 P.2d 245 (1965).

Relating his testimony to several pictures of the deceased, pictures showing a massive wound almost explosive in appearance, Mr. Simmons expressed an expert's opinion that the wound had been produced by a much higher velocity bullet than one fired from a .38 caliber pistol.

Mr. Simmons testified that a .38 caliber pistol such as Damitio's could not in one shot produce the massive explosive-type damage which Damitio had received in his left arm and from which he died, for the pictures enabled the firearms expert to conclude that the wound had been caused by some sort of explosive contact. His testimony could well have been accepted by the jury as compatible with the other evidence as to the cause of Mr. Damitio's death. Medical evidence established that the major structures of the left forearm were literally torn apart or shattered, or, as the coroner, a medical doctor, described the wounds, "frightfully disrupted." The doctor also attributed the fatal wounds to a high velocity missile. X rays showed several metal fragments still in the arm after the doctor had removed some.

Mr. Simmons said that a rifle fired within a range of 4 feet of the object has an explosive effect from the gases following the bullet as well as from the projectile itself. He testified that a .38 caliber pistol would not produce this explosive effect even at close range. From this and other evidence, the jury could well have concluded that Damitio died from a rifle bullet fired at a range of less than 4 feet.

Next we look at the evidence concerning Nelson's participation. Two men, Nelson and Patrick, arrived simultaneously at the hospital at about 10 p.m., both suffering from gunshot wounds. Their wounds are entirely compatible in time and distance with the gunfight at the Damitio residence.

Other skeins of evidence deriving from their arrival at the hospital corroborated the prosecution's theory of their joint participation. Mr. Weaver Berkman of the Aberdeen police department testified that, in response to a telephone call received at the police station, he went immediately to St. Joseph's Hospital in Aberdeen where he met two deputies from the sheriff's office and the three saw Nelson in the emergency room. He heard one of the deputies ask Nelson what had happened and Nelson replied that he was shot. The officer asked where the shooting occurred, to which

Nelson merely said, "in the county." Then the officer inquired whom Nelson had been with and received the answer, "Patrick." The jury could take note of Nelson's failure to divulge anything further about his gunshot wound—a wound which sent him to the hospital on a rainy winter night in the company of another individual (Patrick) also suffering from a gunshot wound. These remarks, standing alone, provided prima facie proof that Patrick and Nelson had been together somewhere in the county when they had been wounded. Nelson's enigmatic brevity in failing to give further explanation when the circumstances reasonably called for it could also have been considered by the jury in weighing all of the evidence in the case.

Thus, we have not only a persuasive case that Dan Damitio died from a rifle bullet and not his own .38 caliber pistol, but evidence connecting Nelson with the killing. The testimony of Alberta Burns, as I have suggested, when added to the evidence already delineated, makes out a strong case against Nelson. She described in detail how Nelson, Patrick and she had met earlier in the day, driven to Nelson's cabin on the lake, procured the second of two rifles, later purchased two pairs of nylon stockings at Montesano, demonstrated how they would be used as a mask, drove in the dark of night to Damitio's house, stopped the car with instructions for her to leave the motor running and drive away temporarily if any cars came by, and Patrick's and Nelson's return to the car, both wounded. She testified that she had to drive the last part of the trip to the hospital and that when they got there she heard Patrick call the police on the telephone. This telephone call dovetailed with that received by Officer Berkman at the Aberdeen police station. (See abstract of testimony of Alberta Burns, Appendix A.)

The testimony of Alberta Burns standing alone, in my opinion, when added to proof of the corpus delicti, gave the jury a sufficient basis for finding Nelson guilty, and, when considered in conjunction with all of the other evidence, made out a strong case against him. She did not testify

affirmatively that, when the men got out of the car leaving her with instructions to keep the motor running, she saw either of them take one of the rifles with him, but a reasonable inference to be drawn by the jury from her testimony on this point is that, due to the rain and darkness, she did not *see* a rifle, not that the men were without a rifle.

I would next consider the reasons for calling Patrick as a witness for the state. Patrick, according to the testimony of A. M. Gallagher, Grays Harbor County Undersheriff, in the first trial of this information (*State v. Nelson*, 65 Wn.2d 189, 396 P.2d 540 (1964) ), had made a detailed oral statement describing how he and Nelson shot Damitio. From these statements, corroborated as they were by other evidence, had come the prosecution's belief that Patrick and Nelson had gone to their victim's residence planning not to force an armed entry but rather to lure Damitio to the door and knock him unconscious with a blow from their gun when he stepped out; that they had alerted Damitio, apparently when they had walked around his house looking for the telephone line to disconnect or in examining the basement to see if the house had a basement entrance which could be used either as a means of access for them or escape for Damitio; and that Damitio had shot them, being wounded by them with the rifle in return.

Understandably, the state hoped to prove these very things through Patrick's testimony at the second Nelson trial since Patrick had, by then, pleaded guilty to and been sentenced for the murder of Damitio and, from the state's point of view, had no legitimate reason to withhold evidence.

Nelson bases his claims of error largely on the direct examination of witness John Patrick, who, prior to taking the stand, had said that he would claim immunity from testifying under the fifth amendment to the United States Constitution. That Patrick's claimed fears of self-incrimination were spurious and illusory and asserted only to help his alleged accomplice is apparent from the fact that he had already pled guilty to and had been sentenced for the sec-

ond-degree murder of Dan Damitio and was actually serving the sentence. The likelihood that the prosecuting attorney might charge him with robbery or burglary arising out of the same events is so remote as to warrant no credence. At any rate, the time to face such a contingency arises not now, but if and when such charges are filed. *Hutcheson v. United States,* 369 U.S. 599, 8 L. Ed. 2d 137, 82 Sup. Ct. 1005 (1962).

The danger of incrimination, to support a claim of immunity under the Fifth Amendment, must be genuine and real. When Patrick pleaded guilty to the killing of Dan Damitio and a judgment had been entered upon the plea and he began the service of his sentence in the penitentiary for second-degree murder, in my opinion, his attorney could well have advised him that he incurred no real risk of further prosecution for lesser offenses involved in the murder if he told the truth. The possibility that he would be brought back from the penitentiary to face a charge of burglary or robbery arising out of the events in which he admitted killing Damitio were so remote as to be completely illusory. See *State v. Satterlee,* 58 Wn.2d 92, 361 P.2d 168 (1961).

On this point, I would accept the rationale of *Hutcheson v. United States, supra,* that the legitimate purposes of a judicial inquiry ought not be thwarted by the possible occurrence of a remote and unlikely event. Time enough to consider the harm should the unlikely event occur. The Supreme Court, in that case, upheld a conviction of contempt for refusal to testify before a select committee of the United States Senate convened to investigate criminality in labor-management relations. The court rejected defendant's right to refuse—a refusal claimed by him under a denial of due process of law rather than the Fifth Amendment for the reason that the witness was under indictment in a state court charging corrupt practices, and both his testimony and refusal before the Senate committee under a claim of immunity of the Fifth Amendment would be admissible against him in the state court.

Answering his claim to immunity from testifying under the due process clause, the court said in *Hutcheson,* at 612:

> The appropriate time for that, had the petitioner in this instance claimed the privilege before the Committee, would have been upon review of his state conviction, when we would have known exactly what use, if any, the State had made of the federal claim. To thwart the exercise of legitimate congressional power, on the basis of conjecture that a State may later abuse an individual's reliance upon federally assured rights, would require of us a constitutional adjudication contrary to well-established principles of ripeness and justiciability.

In the instant case, no charges of burglary or robbery had been filed in any form against the witness Patrick. Had the trial court deemed Patrick's fears of self-incrimination illusory and frivolous and ordered him to give evidence, I would say as the Supreme Court said in *Hutcheson, supra,* at 613, that

> such a challenge should not be dealt with at this juncture. The proper time for its consideration would be on review of the state conviction.

But—to meet the issue head on—even if we assume Patrick's fears of prosecution for burglary or robbery arising out of the events in which Damitio was killed were well founded, I see no reversible error in the examination.[2] Conceding, arguendo, that Patrick had a genuine claim of immunity under the Fifth Amendment, I do not see error in the court's allowing his direct examination and requiring him to assert the claim as to the specific questions put to him.

The majority opinion, I would say, either brushes over lightly or ignores a basic duty of the prosecuting attorney to present all material, competent and relevant evidence in his possession (*Brady v. Maryland,* 373 U.S. 83, 10 L. Ed. 2d

---

[2]Although we held in *State v. Barton,* 5 Wn.2d 234, 105 P.2d 63 (1940), that, since robbery was not a lesser included offense of murder although arising from the same transaction, and an acquittal of murder did not bar a subsequent prosecution for robbery, it would appear that the Fifth-Amendment immunity does not really come into play until the state actually brings a second prosecution.

215, 83 Sup. Ct. 1194 (1963); *Marshall v. United States,* 355 F.2d 999 (9th Cir. 1966) ), and overlooks the principle that the unexplained failure to call to the stand a witness to a crime or one who has relevant knowledge of it may raise a presumption that the evidence would have been unfavorable to the state. *State v. La Porte,* 58 Wn.2d 816, 365 P.2d 24 (1961); *State v. Baker,* 56 Wn.2d 846, 355 P.2d 806 (1960). Believing Patrick to be an eyewitness to as well as a participant in the crime, and knowing him to be available, the prosecution had to call him or risk the inference that, because he was not called, his testimony would have been favorable to the defense and unfavorable to the state.

This brings us to the precise question in issue.

With Patrick in court available as a witness, was it error to put him on the stand before a jury on direct examination despite his pretrial statement that he would claim immunity from testifying under the fifth amendment to the Constitution of the United States?

Patrick, as has been noted, had already pled guilty to the murder of Dan Damitio and, except for the defendant, knew more about Nelson's guilt or innocence than any man alive. Assuming that Patrick may have had a right to claim the Fifth Amendment for himself, the claim of error arises not from Patrick but from the defendant who postulates error on Patrick's claim of immunity, not his own. The error, if any then, as to Nelson, becomes evidentiary, not constitutional. See *Namet v. United States,* 373 U.S. 179, 10 L. Ed. 2d 278, 83 Sup. Ct. 1151 (1963).

The Fifth Amendment is a shield designed to protect the witness, not others. It is a right personal to the witness and cannot be claimed by others. 58 Am. Jur. *Witnesses* § 49. For this reason, the witness must be sworn and must wait until the question has been propounded before he may claim his immunity from answering. Merely putting the question does not render the question improper, for it is the witness's privilege to answer it if he chooses. 58 Am. Jur. *Witnesses* § 53. Indeed, that is precisely what happened here; Patrick did answer several questions which gave

material and relevant evidence to connect Nelson with the murder of Dan Damitio.

The majority opinion implies that, because Patrick was obliged to claim his privilege before the jury, this constituted error in the trial of Nelson, citing *United States v. Tucker,* 267 F.2d 212 (3d Cir. 1959), and *San Fratello v. United States,* 340 F.2d 560 (5th Cir. 1965), or that it was error to have continued the examination once it "became apparent that the witness did in fact intend to claim his privilege." Neither of these ascribed reasons warrants a new trial, in my opinion.

In the first place, this being a jury trial, all relevant evidence should be presented in open court to a jury. Patrick was not on trial. The suggestion that the examination be held first in the jury's absence came from Nelson's attorney, not Patrick. In addition to the 28 questions which Patrick refused to answer were a number which he did elect to answer and in doing so gave (as will later be shown) material, relevant and competent evidence in support of the information. The jury, not the judge, had sole responsibility to measure and weigh his credibility and assess the truthfulness of his answers from his demeanor and appearance on the witness stand, and to relate his evidence to all of the other evidence in the case.

Thus, the claim of error based on a failure to rehearse the testimony before the judge alone without the jury is one that can be based only on the trial court's asserted abuse of discretion in not curtailing or limiting the examination. Direct examination in such circumstances, like cross-examination generally, is a matter resting in the sound discretion of the trial court. That the trial court's discretion was soundly exercised may be seen in the several illuminating answers the witness gave, despite his repeated refusals to answer others. Consequently, I see no abuse of discretion in allowing the examination to proceed.

The rule adopted by the majority would allow criminal conspirators and accomplices no longer on trial to dominate and control the procedure in criminal cases by blandly

announcing before trial that they intend to answer no questions for the reason that the answers might tend to incriminate. It is a rule which will annul the court's power to canvass each question and decide if the answer actually tends to incriminate the witness, and will deprive the prosecution of the very valuable evidence it may elicit before the jury from the questions which are in fact answered.

Patrick's refusals to answer under the Fifth Amendment, as we have seen, were interspersed with a number of answers supplying material and competent evidence. He testified that he was acquainted with Alberta Burns, and that he knew her father. This tended to corroborate in some degree Mrs. Burns' testimony of a prior acquaintanceship between her father and Patrick and supported her statements that she saw on the backseat floor of Patrick's car a rifle which she knew her father had given him. Patrick testified that he was driving a car on or about February 2nd; he stated that he did not own it but that it was registered to him. When asked who owned the car he had been driving that day, he answered, "Hoffman Motors." He testified that the car was a Ford station wagon, 2-seated, and that the backseat folded down. He thus described the automobile which could have taken them to the Damitio house and from there to the hospital.

Asked whether he drove the car anytime on February 2nd, he answered, "a lot of different places—all over Aberdeen," but claimed the Fifth Amendment when asked if he drove it to Amanda Park that day. This testimony corroborated the evidence given by Mrs. Burns. It showed that Patrick not only was capable of driving an automobile, but had been driving it on the crucial day within easy automobile travel of the Damitio residence. Patrick's testimony placed him in the area of ready accessibility to Damitio's house and at a time corroborative of Alberta Burns' testimony describing how the trio drove to Damitio's house that night in Patrick's car. It tends to bear out Mrs. Burns' testimony that Patrick drove the car in which Nelson rode to the agreed place of the crime.

To continue with Patrick's testimony: When asked how long prior to February 2nd he had lived in Grays Harbor County, Patrick testified "Almost all my life," thus supplying evidence from which the jury could infer his knowledge of the area, the back roads, and his easy ascertainment of where Damitio lived. Then, after claiming the Fifth Amendment immunity to several direct questions, the following examination occurred:

Q. Do you know a man by the name of Reinhart Henry Nelson? A. Yes. Q. How well do you know him? A. How long? I don't remember. Q. When did you meet him? A. I don't remember. Q. Did you know him prior to February 2, 1963? A. Yes. Q. You remember how long previous to that? A. No, I don't. Q. How close friends were you, —casual acquaintances? A. Yes. Q. Ever visit back and forth? A. Occasionally.

This evidence again supports Mrs. Burns' testimony. It showed that Patrick and Nelson were not strangers to each other; that they knew each other well enough to visit back and forth occasionally—and thus could readily have met, planned the crime, and actually carried it out. Patrick, in the course of his examination, then was asked if ever he had owned a pistol and he answered, "No." When asked if ever he had had a pistol in his car, he answered, "No." Again, this corroborated in some degree the state's proof that Damitio did not die from a pistol bullet. It corroborated the state's proof that the assailants had not shot into the house with a pistol and that all of the pistol shots came from the inside of the house.

After refusing to answer more questions under a claim of the Fifth Amendment, Patrick did answer several others:

Q. Do you know, —where did Reinhart Nelson live when you were visitng with him, back and forth? A. Amanda Park. Q. Pardon me? A. Amanda Park. Q. And what sort of a place did he live in? A. Lived in a house near a sawmill. Q. Is that near Lake Quinault? A. Yes. Q. About how far is that from Aberdeen? A. About fifty miles. Q. How far is it from Aberdeen to Elma, if you know? A. I don't know. Q. How far is it from Aberdeen to Montesano, if you know? A. Eight miles.

This latter testimony clearly corroborates the testimony of Alberta Burns as to where the three of them went to pick up the rifle and again supports inferences that Patrick had some knowledge of the county and its roads. It provides additional proof of his acquaintance with defendant Nelson and supplies specific evidence of a friendship between Patrick and Nelson.

Allowing the direct examination of Patrick demonstrates the wisdom of the rule that the Fifth Amendment privilege is personal to the witness on the stand and is solely for his benefit (*Rogers v. United States,* 340 U.S. 367, 95 L. Ed. 344, 71 Sup. Ct. 438 (1951) ), and that this constitutional privilege vests in the witness alone and cannot be utilized by the defendant. *State v. Dickens,* 66 Wn.2d 58, 401 P.2d 321 (1965). Since the constitutional privilege belongs to the witness exclusively and cannot be asserted by an accused other than the witness, error in granting or denying the privilege cannot be asserted by a defendant unless he demonstrates that the mere propounding of the questions somehow constituted such a grievous error that the immunity ought to be deemed transferable from witness to defendant.

Wigmore expresses this proposition as follows:

> The privilege, except in the case of an accused in a criminal case . . ., is merely an option of refusal, not a prohibition of inquiry.
>
> . . . Hence it follows that when an *ordinary witness* is on the stand and an incriminating fact, relevant to the issue, is desired to be proved through him, the question may be asked, and it is for him then to say, in terms which the court may reasonably be expected to understand to be a claim of privilege, that he will exercise the option given him by the law. It cannot be known beforehand whether he will plead the privilege . . . . Besides, to prevent the question would be to convert the option into a prohibition.
>
> . . . .
>
> Accordingly, it is almost universally conceded that the question may be put to the *witness on the stand.* 8 Wigmore, Evidence § 2268 (McNaughton rev. 1961).

Common sense, as well as the law, dictates that the privilege against self-incrimination is merely an option of re-

fusal and not a prohibition of inquiry, for if it were otherwise the confessed accomplice to or convicted conspirator in the most brutal and sadistic of crimes could prevent the state from subjecting him to even the mild embarrassment of claiming his immunity in open court by simply making known to the state's attorney his disinclination to take the stand. Hence, the law recognizes no blanket claim of immunity from giving evidence, and the witness must, if he will assert it, claim his right to refuse as to each question asked. *State v. James*, 36 Wn.2d 882, 221 P.2d 482 (1950); *Hutcheson v. United States*, 369 U.S. 599, 8 L. Ed. 2d 137, 82 Sup. Ct. 1005 (1962). The majority opinion refers to *Douglas v. Alabama*, 380 U.S. 415, 13 L. Ed. 2d 934, 85 Sup. Ct. 1074 (1965), and *Pointer v. Texas*, 380 U.S. 400, 13 L. Ed. 2d 923, 85 Sup. Ct. 1065 (1965), as of controlling consequence, but those cases, it seems to me, do not meet the issues presented here.[3]

---

[3]I do not believe either *Pointer v. Texas*, 380 U.S. 400, 13 L. Ed. 2d 923, 85 Sup. Ct. 1065 (1965), or *Douglas v. Alabama*, 380 U.S. 415, 13 L. Ed. 2d 934, 85 Sup. Ct. 1074 (1965), relevant to or authority for the issues present in this case.

*Pointer* involved admission of the transcript of testimony taken at a preliminary hearing where the defendant was present without counsel and did not cross-examine. In holding the admission of the transcript reversible error at Pointer's trial, the Supreme Court said, at 407:

> The case before us would be quite a different one had Phillips' statement been taken at a full-fledged hearing at which petitioner had been represented by counsel who had been given a complete and adequate opportunity to cross-examine. . . . Because the transcript of Phillips' statement offered against petitioner at his trial had not been taken at a time and under circumstances affording petitioner through counsel an adequate opportunity to cross-examine Phillips, its introduction in a federal court in a criminal case against Pointer would have amounted to denial of the privilege of confrontation guaranteed by the Sixth Amendment.

In *Douglas,* the prosecution managed to get before the jury the contents of a written confession of an accomplice who refused to testify under the Fifth Amendment by reading segments of the statement to the witness and asking him, "Did you say that," or "Did you make the further statement," or words to that effect. Basing its ruling on the proposition that, in losing his right to cross-examine the witness as to the statement because of the latter's refusal to testify under the Fifth Amendment, the defendant on trial had been deprived of his right of confrontation under the Sixth Amendment, saying at 419:

> In the circumstances of this case, petitioner's inability to cross-examine Loyd as to the alleged confession plainly denied him the

300

*Namet v. United States,* 373 U.S. 179, 10 L. Ed. 2d 278, 83 Sup. Ct. 1151 (1963), holds that the defendant has no constitutional privilege to the Fifth-Amendment immunity of a witness. In that case, as here, the prosecution called and examined a witness who had earlier declared his intention to claim his Fifth-Amendment privilege against self-incrimination. Characterizing the defendant's claim of error to the calling and examining of the witness as evidentiary only and not constitutional, the court said, "All that case involves, in short, is a claim of evidentiary trial error." Then, accepting the rationale of *United States v. Gernie,* 252 F.2d 664 (2d Cir. 1958), and *Weinbaum v. United States,* 184 F.2d 330 (9th Cir. 1950), as to the calling of the witness by the prosecution, the Supreme Court said in *Namet v. United States, supra,* at 187:

> And even when the objectionable inferences might have been found prejudicial, it has been held that instructions to the jury to disregard them sufficiently cured the error. (Footnote omitted.)

Finally, in expressing views which I believe warrant an affirmance here, is the following statement from *Namet,* at 187:

> We need not pass upon the correctness of the several lower court decisions upon which the petitioner relies, for we think that even within the basic rationale of those cases reversible error was not committed in this case. In the first place, the record does not support any inference of prosecutorial misconduct. It is true, of course, that Mr. Fitzgerald announced that the Kahns would invoke their testimonial privilege if questioned. But certainly the prosecutor need not accept at face value every asserted claim of privilege, no matter how frivolous. In this case, the prosecutor initially did not believe that the Kahns could properly invoke their privilege against self-incrimination, reasoning with some justification that their plea of guilty to the gambling charge would erase

---

right of cross-examination secured by the Confrontation Clause. . . . Since the Solicitor was not a witness, the inference from his reading that Loyd made the statement could not be tested by cross-examination. . . . Nor was the opportunity to cross-examine the law enforcement officers adequate to redress this denial of the essential right secured by the Confrontation Clause.

any testimonial privileges as to that conduct. (Footnote omitted.)

It is the judge, not the witness, who decides upon the admissibility of evidence, and the instant case demonstrates well the sound reasons for this rule. Patrick, in electing to answer a number of questions, did, as we have seen, supply material and competent evidence in support of the information—evidence which may well have been denied the jury if the prosecution were required to rehearse the examination in the jury's absence, or had the court been obliged to accept at face value the witness's assertion that he would not testify. Hence, where a witness claims the Fifth Amendment, it is the trial judge, not the witness or the defendant, who has the discretion as to the extent of the examination to be allowed, whether and to what extent a rehearsal shall be required in the jury's absence, and which particular questions may incriminate the witness. Only when the trial court manifestly abuses this discretionary power should a conviction be reversed on appeal.

If the state cannot call and examine a witness who may claim his right to refuse on the grounds of self-incrimination and the claim is held to estop the prosecution even from asking the questions, how can the court rule on whether the answers will tend to incriminate? Why, then, could not every recalcitrant witness avoid giving evidence simply by notifying the prosecuting attorney that he will claim the Fifth Amendment?

The majority suggests that this problem will be avoided if the court but retires the jury and hears the question in its absence. Not only, however, does this procedure usually prove cumbersome and awkward, but, more importantly, deprives the state of a valuable right to have an important part of the trial take place before the jury. Who is to decree as a matter of law that the witness will not, under the stimulus of the jury's presence, answer a number of questions which he would categorically refuse to answer in the jury's absence? Had the judge been required, in the jury's absence, to hear and rule on all questions first, the

state would undoubtedly have been met with a categorical refusal by Patrick to answer any.

I would say, therefore, the state has a right to require that the claim of the Fifth Amendment be made in the presence of the jury—subject only to a clear abuse of the trial court's discretion—for it is altogether likely that the witness will be inclined to answer more questions before the jury than in its absence.

Guarding against an abuse of the state's right to call a witness who may claim his Fifth-Amendment privilege, the law provides several safeguards:

1. If it appears to the trial judge that the examination has become an inflammatory device rather than a tool to elicit relevant, competent evidence, the court, in the exercise of a sound reviewable discretion, can terminate the examination.

2. The court may instruct the jury to disregard the questions and heed the answers only, by pointing out the evidence comes from the witnesses, not the examiners, and may so caution the jury from time to time.

3. The court may, in the jury's absence, require the prosecuting attorney to demonstrate that the prosecution has legitimate reasons to believe that the witness possesses material and relevant knowledge and that the examination is done in good faith and not merely to fish for information before the jury.

All three safeguards rest where they belong—in the trial court's discretion.

Although we did not spell out the reasons for permitting Patrick's examination before the jury in the first trial, we did rule that questioning him was not error (*State v. Nelson*, 65 Wn.2d 189, 396 P.2d 540 (1964)); by inference we left the matter to the discretion of the trial judge; we should stay with that ruling.

Therefore, I would state the rule to be that the prosecuting attorney may call a witness to the stand who has indicated an intention to refuse to testify on the grounds that the answers may tend to incriminate him (1) when the

prosecuting attorney reasonably and in good faith believes that the witness has material, competent and relevant evidence to give; (2) when there is a reasonable possibility that the witness may, in answering some questions, while claiming the Fifth Amendment privilege has to others, supply material evidence tending to prove material issues of fact in the case; and (3) when the examination is conducted in such a manner as to show a purpose to elicit material and relevant answers to legitimate questions, *i.e.,* in such a way as to demonstrate that the prosecutor intends the answers and not the questions to constitute the evidence.

In *State v. Weekly,* 41 Wn.2d 727, 252 P.2d 246 (1952), we said, at 728:

> The good faith of counsel can be tested by the following, among other inquiries: Was the question based upon facts established by the record? Was it material and relevant? Did counsel have any basis for a belief that the court would overrule an objection to it? Did counsel abide the ruling of the court and not pursue the inquiry after the objection was sustained? Each of these questions must be answered in the affirmative in this case.

When the examination is so conducted, it then rests within the sound discretion of the trial court as to how protracted or detailed the examination may be.

Accordingly, if the prosecuting attorney believes that a witness possesses vital evidence concerning the commission of a crime by the defendant on trial, he has a sworn duty to present that witness to the jury. And who could possibly possess more vital and cogent evidence of a murder than an accomplice to the fact—one who planned, talked over with, and went to the scene of the killing with the defendant, one who was present and saw and heard the fatal shots fired and who fled from the scene with the accused and then entered the hospital at the same time with the accused for the treatment of wounds each received in the gunfight in which the victim met his death?

The law ought not create devices which place control of criminal prosecutions in the hands of avowed criminals nor

develop procedures which prevent the prosecuting attorney from carrying out his oath of office.

I would affirm.

HUNTER, J., concurs with HALE, J.

ROSELLINI, J., concurs in the result of the dissent.

APPENDIX A

Abstract of testimony of Alberta Burns

February 2, 1963, Alberta Burns and Tom Patrick, riding in Patrick's car, stopped for gas in Hoquiam; afterwards they stopped at a tavern called the Wigwam; and then made a stop at the Oxbow Tavern for hamburgers and coffee and then drove to a tavern at Amanda Park where they met defendant Nelson around 4 or 4:30. They had quite a few beers at the tavern and played shuffleboard. While there, Patrick and Nelson left her alone for about 5 minutes, and when they returned, all three left the tavern and drove to Nelson's cabin on Lake Quinault. The three went into the cabin where they stayed for a few minutes and then returned to the car, one of the men bringing a rifle with him from the cabin. She saw one of the men put the rifle on the floor behind the front seat where she also knew there was another rifle once belonging to her father. She asked what the gun from the Nelson cabin was for, and one of them said, "Something was up."

They then started out in Patrick's car from the Nelson cabin, driving toward Aberdeen and stopping again at the Oxbow for coffee. After leaving the Oxbow, they proceeded toward Aberdeen, stopping another time at the Midway Tavern for coffee. It was now dark. Leaving the Midway Tavern, they drove toward Montesano, and while en route, Patrick, in Nelson's hearing, asked her if she had any nylons to which she answered, "No." Patrick stopped at the Safeway store in Montesano and said, "I want you to get some nylons," and she went across the street and bought two pairs of nylon stockings. After she returned to the car with the nylons, the three, with Patrick driving and Mrs. Burns in the middle, drove toward Elma. It was now quite dark. They drove through what she described as a cedar field on the main road and turned off into a side road. Just as they turned off onto the side road, she heard a conversation between Nelson and Patrick concerning a car in a garage with no lights on.

They continued driving down the side road for about a mile when Patrick stopped the car, and she heard the two men have a conversation concerning "which would be the best to go in."

While the car was stopped, Mrs. Burns took the bag containing the purchased nylons from the glove compartment, opened the sack, and laid the stockings on her lap. Nelson picked up one of the stockings and stretched the top of it with his hands. She saw him "put it around—

trying to stretch it around his head or doing something with it around his head."

She said they stopped at a service station, and Nelson and Patrick got out of the car. Just before they stopped, and while Nelson was still in the car, Patrick "told me to keep in the car and keep the motor going, and if a car came along, to drive until I passed the car and then turn around and come back." She said that a car did come by, and, following these instructions, she pulled out until the car passed, turned around, and came back, being headed finally toward Elma, opposite from the direction from which they had approached the service station. Before doing this, the two men had left the automobile, but Patrick came back to get a flashlight. It was dark while she waited in the car for the two men, there being no lights in the store or the Damitio home. A little while later, the two men returned, Patrick arriving first. He got in on the driver's side. Nelson reached the car about a minute later. As he reached the front of the car, he leaned over the front fender; then, getting into the automobile, he said, "I am shot!" A little while later Patrick said he was shot, too. With Patrick at the wheel, they drove toward St. Joseph's Hospital in Aberdeen. Before reaching the hospital, Patrick stopped the car, told her that his hand was hurting him, and Mrs. Burns took over the driving. She drove them straight to St. Joseph's Hospital in Aberdeen. Mrs. Burns drove the car, with the two wounded men, up to the emergency entrance, and hospital attendants helped Nelson out of the car and put him on a stretcher. They arrived at the hospital about 10 o'clock, and she heard Patrick make a telephone call to the police station in Aberdeen.

Mrs. Burns says that, in response to the telephone calls, some deputy sheriffs and the Aberdeen police arrived at the hospital; the sheriff's deputies took Mrs. Burns to the sheriff's office in Montesano.

[Adverting to the earlier testimony, she testified] she saw two men get out of the car after they stopped at the service station, but she did not see whether either had anything in his hands. She waited for them; she heard nothing. She remembered that Patrick came back once to the car to get a flashlight, 10 or 15 minutes after he had left the first time. She says she did not see them remove the nylons from the car, but would have been unable to see them if they had done so.