**FILED
JUNE 6, 2024
In the Office of the Clerk of Court
WA State Court of Appeals, Division III**

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 38413-6-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL JOSEPH ALLRED, | ) | UNPUBLISHED OPINION |
| a/k/a MICHAEL JOSEPH NAVARRO, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |
| OSCAR IBARRA, | ) | |
| | ) | |
| Defendant. | ) | |

LAWRENCE-BERREY, C.J. — A jury convicted Michael Allred of four counts of

first degree assault and one count of each of the following: first degree unlawful

possession of a firearm, tampering with a witness, attempted first degree arson, attempted

first degree murder, and felony harassment—threat to kill. Mr. Allred appeals his

convictions and his standard range sentence of 1,066 months. He argues we should

reverse his convictions and sentence for the following reasons:

- Constitutional speedy trial violations
- Rule-based time-for-trial violations
- Partial jury
- Evidentiary errors
- Evidentiary insufficiency
  - Two assault convictions
  - Attempted first degree arson and attempted first degree murder
  - Tampering with a witness
- Exploiting a witness's Fifth Amendment protections
- Ineffective assistance of counsel
- Sentencing errors

We vacate Mr. Allred's witness tampering conviction, but affirm his other convictions. We direct the trial court to strike the court-appointed attorney fee assessed against Mr. Allred, and to vacate the no-contact order protecting an assault victim who died before trial. For reasons explained in our opinion, our reversal of Mr. Allred's witness tampering conviction does not reduce the offender score, so resentencing is not required.

FACTS

*Shooting and original charges*

On January 22, 2017, Michael Joseph Allred[1] drove Oscar Ibarra to a home in Wapato to confront Rafael Almaguer, who was romantically involved with a woman Mr. Ibarra also was dating.

---

[1] Mr. Allred also is known as "Michael Joseph Navarro" and "Joker."

An altercation ensued in the driveway of the home. At Mr. Ibarra's urging, Mr. Allred drew a firearm and discharged one round in the direction of (1) Rafael Almaguer, (2) Mr. Almaguer's mother Sylvia Almaguer, (3) Marlowe Olney, and (4) Mr. Almaguer's aunt Conseulo Cantu. The bullet grazed Mr. Olney and struck Ms. Cantu in the shoulder, superficially injuring the former and gravely injuring the latter. Mr. Allred and Mr. Ibarra fled in a black Volkswagen Jetta. Mr. Ibarra, who was using crutches at the time, left one crutch at the scene.

Two days later, law enforcement located Mr. Allred and a black Jetta at a residence in Yakima. Also present at the residence was Jose Cardenas, a known gang affiliate. Inside the Jetta, officers discovered a gun safe containing two nine-millimeter rounds—the same caliber of bullet Mr. Allred had fired during the altercation in Wapato. Officers also discovered a Western Union receipt with Mr. Allred's alias on it, a single crutch, and several handwritten letters.

The State charged Mr. Allred with four counts of assault in the first degree and with unlawful possession of a firearm in the first degree.

*Pretrial delays: original charges*

Although the trial court arraigned Mr. Allred on the assault and firearm charges on February 8, 2017, his case by May 17, 2019 still had not come to trial. Mr. Allred remained in custody during this time.

3

No. 38413-6-III
*State v. Allred*


The following chart shows the dates of the continuances and resets the trial court

granted, at whose request and for what reason the court granted each continuance or reset,

whether defense counsel or the defendant objected, and the new date set for trial:[2]

| Date | Event | State/Defense/Agreed/Court | Trial date ordered | Citations |
|---|---|---|---|---|
| 2/8/17 | Arraignment | N/A | 4/3/17 | Clerk's Papers (CP) 8 |
| 3/23/17 | Continuance | Defense (for the purpose of completing witness interviews) | 6/12/17 | CP 9 |
| 5/31/17 | Reset | Defense (in anticipation of a State's motion to continue) | 6/26/17 | 1 RP 23-25 |
| 6/14/17 | Reset | Agreed (for the purpose of completing witness interviews) | 7/10/17 | 1 RP 26-28 |

---

[2] For ease of reading, the charts in our opinion use the following shorthand references to various reports of proceedings:

- Rep. of Proc. (RP) (1/25/17 – 8/9/21) is referred to as "1 RP"

- RP (9/18/18) is referred to as "2 RP"

- RP (4/20/18 – 10/12/18) is referred to as "3 RP"

- RP (4/20/18 – 1/6/21) is referred to as "4 RP"

- RP (10/12/18 – 2/22/19) is referred to as "5 RP"

- RP (10/2/18) is referred to as "6 RP"

- RP (6/28/21 – 7/8/21) is referred to as "7 RP"

- RP (7/1/21 – 7/8/21) is referred to as "8 RP"

| 6/30/17 | Continuance | State (for the purpose of completing witness interviews; order marked agreed, but RP indicates defense opposition). Defendant himself objected. | 9/18/17 | 1 RP 29-39; CP 12 |
|---|---|---|---|---|
| 8/30/17 | Reset | State (for the purpose of completing witness interviews). Defendant and defense counsel objected. | 10/9/17 | 1 RP 35-41; CP 13 |
| 9/27/17 | Reset | Unclear (defense struggling to interview State witnesses) | 10/16/17 | 1 RP 42-43; CP 14 |
| 10/4/17 | Continuance | Agreed (owing to illness, defense counsel needed additional time to complete witness interviews). Defendant himself objected. | 11/27/17 | 1 RP 45-48; CP 15 |
| 11/8/17 | Reset | Agreed (for the purpose of completing witness interviews) | 12/11/17 | 1 RP 50-52; CP 16 |
| 11/29/17 | Continuance | State (for the purpose of completing witness interviews and synchronizing with co-defendant's trial date). Defendant and defense counsel jointly objected. | 1/2/18 | 1 RP 55-62; CP 18 |
| 12/20/17 | Reset | Agreed (for the purpose of completing witness interviews) | 1/16/18 | 1 RP 64-71 |
| 1/10/18 | Continuance | Defense (for the purpose of contacting witnesses and accommodating defense counsel's trial calendar). Defendant himself objected. | 3/26/18 | 1 RP 72-78; CP 23 |
| 3/23/18 | Reset | State (for the purpose of synchronizing with co-defendant's trial date) | 4/23/18 | 1 RP 79-81; CP 24 |

| 4/20/18 | Continuance | Agreed (for the purpose of interviewing a defense witness in custody) | 5/29/18 | CP 32 |
|---------|-------------|--------------------------------------------------------------------|---------|-------|
| 6/22/18 | Continuance | State and court (for the purpose of accommodating codefendant's counsel's schedule) | 8/27/18 | 3 RP 10; CP 42 |
| 9/18/18 | Continuance | Defense (for the purpose of interviewing a defense witness in custody) | 10/1/18 | 2 RP 1-10; CP 130 |
| 10/2/18 | Attorney withdrawal/ disqualified | Defense (conflict of interest arose where defense counsel expected to be called as witness to testify as to statements of unavailable declarant) | N/A | 6 RP 1-113; CP 149 |
| 10/12/18 | Continuance | Defense (substitution of counsel). Defendant himself objected. | 3/20/19 | 3 RP 11-17; CP 153 |
| 2/22/19 | Continuance | Defense (for the purpose of trial preparation). Defendant himself objected. | 6/10/19 | 5 RP 28-30; CP 165 |
| 5/17/19 | Continuance | Defense (for the purpose of trial preparation and re-interviewing witnesses interviewed by prior counsel). Defendant himself objected. | 9/30/19 | 1 RP 87-94; CP 175 |

*Additional charges*

Before Mr. Allred's September 30, 2019 trial date, the State obtained letters Mr.

Allred had entrusted to a fellow inmate scheduled for release. In one of those letters—to

be given to Jose Cardenas—Mr. Allred urged Mr. Cardenas to burn down the house of

6

the State's "star witness," Sylvia Almaguer, "unless someone wants to go for the

guarantee." S-Ex. 106. The letter provided a map to Ms. Almaguer's house and directed

Mr. Cardenas to a Facebook page where he could find photographs of Ms. Almaguer.[3]

As corroborating the letter's authorship and intended recipient, the State obtained

recorded telephone calls from Mr. Allred's jail account to Mr. Cardenas. During those

calls, Mr. Allred asked whether Mr. Cardenas had received his letters. On one of the

recorded calls, Mr. Allred identifies himself as Michael Navarro—Mr. Allred's legal

name—and provides a home address that is the same address Mr. Allred used to file his

tax return.

Acting on this evidence, law enforcement alerted Ms. Almaguer to the threats Mr.

Allred had made against her. The State also filed four additional charges against Mr.

Allred: witness tampering, attempted first degree arson, attempted first degree murder,

and felony harassment—threat to kill.

---

[3] The letter stated in relevant part:
The witness on my case never shows to interviews but tells when they bring
her in. They all live in the same pad. No guns. They're relatively
harmless. Too many bodies though. It'll cause too much attention. But if
the house burnt though. Cops couldn't find them and like I said they rarely
come in on they [sic] own. Unless someone wants to go for the guarantee.
The star witness is Sylvia Almaguer. There [sic] a picture of her on
Facebook under "Chiva Almaguer". She live [sic] at: [address and map to
house].
S-Ex. at 106.

7

*Pretrial delays: amended charges*

The additional charges resulted in a continuance of Mr. Allred's September 30,

2019 trial date, and set off a spate of further continuances:

| Date | Event | State/Defense/Agreed/Court | Trial date ordered | Citations |
|------|-------|---------------------------|--------------------|-----------|
| 9/27/19 | Continuance | Agreed (for the purpose of trial preparation arising from new charges). Defendant himself objected. | 1/13/20 | 1 RP 100, 107; CP 190 |
| 12/11/19 | Continuance | Defense (for the purpose of hiring handwriting expert). Defendant himself objected. | 4/13/20 | 1 RP 113-17; CP 198 |
| 3/11/20 | Continuance | Agreed (new prosecutor assigned; parties needed time to negotiate and prepare for trial). Defendant himself objected. | 8/10/20 | 1 RP 118-21; CP 201 |
| 7/1/20 | Continuance | Agreed (no reason given; order inaccurately attributes motion exclusively to State) | 11/16/20 | 1 RP 124-26; CP 207 |
| 9/9/20 | Continuance | Agreed (did not alter trial date; hearing was for purpose of allowing defendant to be present). Defendant himself objected. | 11/16/20 | 1 RP 127-31 |
| 11/6/20 | Continuance | Agreed (for the purpose of researching Mr. Allred's criminal history). Defendant himself objected. | 2/8/21 | 1 RP 137-38; CP 215 |

| 1/29/21 | Continuance | Agreed (defense counsel acknowledged needing time "to effectively represent Mr. Allred"). Defendant himself objected. | 5/3/21 | 1 RP 145; CP 273 |
|---------|-------------|---------------------------------------------------------------------------------------------------------------------------|--------|------------------|
| 5/5/21  | Continuance | Defense (defense counsel contracted COVD-19). Defendant himself objected. | 6/28/21 | 1 RP 156-62; CP 414 |

*Trial: voir dire*

Trial began on June 28, 2021, with jury selection. The issues raised on appeal by Mr. Allred require us to focus on four particular venire jurors—jurors 26, 6, 37, and 41.

In juror 26's written juror questionnaire, he asked to speak to the judge and attorneys in private. In the questionnaire, he explained that his family had been in gangs, and he had been around gangs. In the private interview, he expressed fear for himself and his family if he had to serve on a criminal trial involving gangs. He initially said his fear could as easily cause him to convict as to acquit, but later said it probably would more likely cause him to convict. He agreed that everyone deserves a fair trial, even gang members, but was unsure if he could be neutral. Mr. Allred moved to strike juror 26, and the trial court denied his motion, explaining: "He's identified his biases. We all have biases. I think he's going to do his best to be neutral." 7 RP at 285. Later, Mr. Allred used one of his peremptory strikes to remove juror 26.

Juror 6 responded as follows to questions from defense counsel:

9

[Defense counsel]: . . . [I]f we believed [the State] didn't prove it beyond a reasonable doubt and we [did not put on evidence but] just went to closing arguments and said they didn't prove it and we pointed out why, could you find somebody not guilty if they didn't put on any proof?

[Juror 6]: Okay. Let's back up here a little bit. The [S]tate's got enough proof to say he was guilty. You're saying without a reasonable doubt the guy's guilty with what the [S]tate's got?

[Defense counsel]: I'm saying—

[Juror 6]: Then you don't put the person up to testify for themselves? I would think he would have to be guilty.

[Defense counsel]: Okay. That's probably true. But if you— whether if he believes they didn't have the proof beyond a reasonable doubt, would it bother you if we didn't put anything up?

[Juror 6]: If you didn't put nothing up?

[Defense counsel]: Uh-huh.

[Juror 6]: I would to go on the guilty side.

[Defense counsel]: What if the [S]tate didn't have the proof?

[Juror 6]: If the [S]tate didn't have the proof then I would have to go not guilty.

[Defense counsel]: Okay. Well, that's what we hope.

[Juror 6]: If they did have the proof and [the defense] didn't bring nothing to the table, I'm going to go on the guilty side.

7 RP at 328-29. Likely because of the last two answers, Mr. Allred did not challenge juror 6.

Jurors 37 and 41 each answered that serving on the jury would interfere with their professional obligations because work was busy and no one else could do their job. Mr. Allred did not seek to remove these jurors. Jurors 6 and 37 were selected as jurors, and juror 41 was selected as an alternate juror. The parties were allocated one peremptory

10

strike for each of the two jurors. Mr. Allred did not use an available peremptory strike to remove juror 41.

*Trial: case in chief*

The State presented the following evidence to the jury:

- Eyewitness testimony from Sylvia Almaguer, who stated that Mr. Allred drew his firearm and discharged the round that wounded Mr. Olney and Ms. Cantu. Ms. Almaguer further testified that prior to the shooting she had been arguing with Mr. Ibarra, and that Mr. Ibarra had instructed Mr. Allred to "[s]hoot that bitch." 8 RP at 565.
- Eyewitness testimony from William Eneas, who saw Mr. Allred fire the round in question.
- Eyewitness testimony from Miranda Senator-Stahi, a neighbor who saw Mr. Allred fire the round in question.
- Testimony from handwriting expert Andrew Szymanski, who confirmed that the letter urging Mr. Cardenas to harm Ms. Almaguer was authored by the same person who had written letters discovered in the seized black Jetta.
- Testimony from jail staff confirming (1) the calls to Mr. Cardenas discussing smuggled letters came from Mr. Allred's jail account, and (2) the voice addressing Mr. Cardenas on the telephone calls was Mr. Allred's.
- Testimony from jail staff stating that gang members in custody regularly contacted Mr. Cardenas.

The State also called Mr. Cardenas as a witness. However, in response to the State's questions about his home address, his phone number, and if he knew Mr. Allred, Mr. Cardenas responded, "I'm not answering any questions." 8 RP at 637. The State asked no further questions.

11

While Mr. Olney did testify, he stated that he could not recall details of the 2017 shooting because, after that shooting, he suffered a cranial gunshot wound. Ms. Cantu and Mr. Almaguer did not testify. Ms. Cantu was suffering from psychiatric issues that prevented her from testifying. Mr. Almaguer had died prior to trial.

Mr. Allred did not testify or call any witnesses.

At the conclusion of evidence, the trial court and the attorneys discussed various issues outside the jury's presence. During this discussion, the trial court asked whether there was a proposed instruction limiting the purpose for which the jury could consider gang membership. Mr. Allred's counsel declined the instruction, stating "there's been so little testimony regarding gangs I don't . . . want the instruction because I don't want to put undue emphasis on that point on that evidence." 8 RP at 805.

*Verdict and sentencing*

The jury convicted Mr. Allred on all counts, and the trial court imposed a standard range sentence of 1,066 months. The lengthy term resulted from running several sentences and enhancements consecutively, as required by RCW 9.94A.589(1)(b) (two or more serious violent offenses arising from separate and distinct criminal conduct—the four assault convictions and the attempted murder conviction) and RCW 9.94A.533(3)(a), (e) (five-year enhancements added to each of the four class A first

degree assault convictions).[4]  The trial court also imposed (1) a no-contact order

protecting Mr. Almaguer, despite Mr. Almaguer being deceased, and (2) a $600 court-

appointed attorney fee, despite finding Mr. Allred indigent.

Finally, the trial court found that Mr. Allred's convictions for the second set of

offenses—witness tampering, attempted first degree arson, attempted first degree murder,

and felony harassment—arose from the same criminal conduct.  Accordingly, the court

counted these four convictions as 1 point for scoring purposes, and ran those four

sentences concurrently.

Mr. Allred timely appeals his judgment and sentence.

ANALYSIS

A.    CONSTITUTIONAL SPEEDY TRIAL AND TIME-FOR-TRIAL RULE

Mr. Allred argues the four-year delay between his first arraignment and trial

violated both his constitutional right to a speedy trial and Washington's time-for-trial

rule.  As explained below, because most of the four-year delay is chargeable to Mr.

Allred, the delay did not violate his constitutional right to a speedy trial.  Because Mr.

---

[4] Mr. Allred's offender score was a "9+" on his attempted first degree
murder conviction and a "0" on his first degree assault convictions.  *See*
RCW 9.94A.589(1)(b) (highest seriousness offense is scored using prior and
current convictions that are not serious, and other serious convictions are scored
as a "0.")  Mr. Allred's offender score for his attempted murder conviction was a "9+"
partly because he had six prior adult felony convictions and four juvenile convictions.

13

Allred did not specify which of his many continuances violated our State's time-for-trial rule, we decline to address his rule-based challenge.

*Standard of review*

This court reviews both constitutional speedy trial and rule-based, time-for-trial challenges de novo. *State v. Rafay*, 168 Wn. App. 734, 769, 285 P.3d 83 (2012).

1.    *Constitutional speedy trial*

Where a defendant alleges a violation of his speedy trial right under the Sixth Amendment to the United States Constitution, Washington courts apply the framework provided in *Barker v. Wingo*, 407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972). *State v. Iniguez*, 167 Wn.2d 273, 283-84, 217 P.3d 768 (2009).

Under *Barker*, a petitioner must first show the delay in his case "crossed a line from ordinary to presumptively prejudicial." *Iniguez*, 167 Wn.2d at 283. Meeting that threshold triggers the remainder of the *Barker* inquiry, which examines (1) the length of the delay, (2) the reasons for the delay, (3) whether the defendant asserted his right to a speedy trial, and (4) whether prejudice resulted. *Id*. None of these factors are necessary or sufficient, however, as other circumstances may be relevant to the inquiry. *Id*.

Here, case law is clear and the parties agree that a four-year delay from arraignment to trial is presumptively prejudicial. *Doggett v. United States*, 505 U.S. 647, 652 n.1, 112 S. Ct. 2686, 120 L. Ed. 2d 520 (1992) (one year between arraignment and

14

trial is the threshold at which the prejudice presumption arises). This presumption triggers the remainder of the *Barker* analysis.

### i. Length of delay

Because Mr. Allred's trial began more than four years after his first arraignment, the delay in his case greatly exceeded the one-year presumptive prejudice threshold. The first *Barker* factor weighs heavily in Mr. Allred's favor.

### ii. Reasons for delay

The parties disagree as to which portions of the four-year delay are chargeable to Mr. Allred, to the State, or to the court. By our analysis, only 5 of the 26 delays the trial incurred were chargeable exclusively to the State or to the court or both. By contrast, 21 of those delays were requested by, agreed to, or unopposed by Mr. Allred's counsel. While Mr. Allred himself objected in many instances, delays sought by defense counsel are chargeable to the defendant. *State v. Ollivier*, 178 Wn.2d 813, 832, 312 P.3d 1 (2013).

Moreover, Mr. Allred bears responsibility for the delays arising from his attempt to murder the State's star witness. The new charges arising from that conduct substantially increased the volume of material the State needed to investigate, analyze, and present. Defense counsel likewise needed additional time to review the State's new evidence and develop a rebuttal. Plainly, these delays flowed from Mr. Allred. A

15

defendant may not complicate a prosecution by engaging in additional criminal activity and then cry foul when the State requires additional time to prosecute that activity. Accordingly, the second *Barker* factor weighs heavily in the State's favor.[5]

### iii. Asserted rights

Because Mr. Allred himself repeatedly objected to continuances and other trial delays, the third *Barker* factor arguably favors his speedy trial argument. However, Mr. Allred's counsel generally did not object to continuances—which were necessary so the parties could conduct witness interviews—and the posture of defense counsel with respect to continuances imputes to the defendant himself. *Id.* Accordingly, the third *Barker* factor is neutral.

### iv. Prejudice

Although the delay between arraignment and trial was lengthy, and although Mr. Allred personally objected to many continuances and other postponements, there is nothing to indicate prejudice to the defendant. The State's case against Mr. Allred was irrefutable. Multiple eyewitnesses testified that Mr. Allred fired the gun in the direction of four individuals, injuring two of them. A handwriting expert confirmed Mr. Allred's

---

[5] Mr. Allred argues the State contributed to the delay by prosecuting the additional charges together with the original charges. In fact, prior to trial, Mr. Allred unsuccessfully moved to sever the charges. On appeal, Mr. Allred does not argue the trial court erred by denying his severance motion. Had we concluded that the charges should have been severed, we would have weighed this factor differently.

authorship of the letter giving rise to the additional charges, and Mr. Allred's own telephone call to Mr. Cardenas confirmed his authorship as well. In short, whatever the delay before trial, it made no difference to the outcome. The fourth *Barker* factor weighs in the State's favor.

### v. Conclusion

The lengthy delay between the first arraignment and trial was due to Mr. Allred's initial counsel withdrawing because of a conflict, Mr. Allred thereafter committing serious crimes resulting in additional charges, investigation, discovery, and preparation, and the difficulty both parties faced in scheduling witness interviews. Mr. Allred does not assert that the delay was because of State misconduct or disorganization. For these reasons, and because Mr. Allred was not prejudiced, we conclude that the State did not violate Mr. Allred's Sixth Amendment speedy trial right.

### 2. Time for trial

Where a defendant is in jail, CrR 3.3(b)(1)(i) requires the State to try his charges within 60 days of arraignment. Excluded from this period are continuances the trial court grants that are required for the administration of justice and do not prejudice the defendant. CrR 3.3(e)(3), (f). Delays arising from unavoidable or unforeseen circumstances beyond the control of the court or of the parties also are excluded from the 60-day period. CrR 3.3(e)(8). Upon disqualification of a defendant's or State's attorney,

17

the 60-day period resets. CrR 3.3(c)(2)(vii). Finally, the time for trial will not lapse

sooner than 30 days after the conclusion of any excluded period. CrR 3.3(b)(5).

In his opening brief, Mr. Allred provides a general discussion of our time-for-trial

rule, but fails to discuss which of the many continuances violated the rule. Instead, he

"maintains that the record is insufficient to justify many of the continuances where he

objected (14 times) and/or where he was not present (17 times)." Am. Br. of Appellant at

74.

An appellate court may decline to consider a claim or contention that is

unsupported by legal analysis. *See Schroeder v. Excelsior Mgmt. Group, LLC*,

177 Wn.2d 94, 108, 297 P.3d 677 (2013). Here, Mr. Allred's vague and expansive claim

required the State to examine over two dozen continuances and guess which, if any, Mr.

Allred believed violated speedy trial rules. Although Mr. Allred, in his reply, focused on

a small number of continuances, his narrowed arguments came too late, and the State was

unable to respond. For this reason, we will not consider an argument raised for the first

time in a reply brief. *In re Marriage of Bernard*, 165 Wn.2d 895, 908, 204 P.3d 907

(2009). We decline to consider Mr. Allred's rule-based challenge.

B.    IMPARTIAL JURY CHALLENGE

Mr. Allred argues the trial court violated his constitutional right to an impartial

jury where it refused his for-cause challenge of juror 26, thereby forcing Mr. Allred to

18

use a preemptory challenge on that juror, rather than on another undesirable juror—

namely jurors 6, 37, or 41. We disagree.

*Juror bias*

Both our federal and state constitutions guarantee criminal defendants the right to

trial by an impartial jury. *State v. Irby*, 187 Wn. App. 183, 192, 347 P.3d 1103 (2015).

A trial court that seats a biased juror violates this right. *Id.* at 193. A juror harbors

implicit bias where they (1) are related to or share an interest with either party, (2) served

as a juror on a previous trial against the defendant, or (3) have an interest in the outcome

of the trial. RCW 4.44.180. A juror harbors actual bias where they "cannot try the

issue impartially and without prejudice to the substantial rights of the [defendant]."

RCW 4.44.170(2). Even where a juror exhibits biased opinions, however, a court may

seat that juror if it concludes, from all the circumstances, that the juror may disregard

their opinions and decide the case impartially. RCW 4.44.190.

i. *Juror 26*

Here, Mr. Allred peremptorily struck juror 26, preventing that juror from serving

at trial. Accordingly, any impartiality juror 26 harbored did not undermine the integrity

of the verdict the jury returned.

Nevertheless, Mr. Allred argues the necessity of exercising a preemptory strike against juror 26 prejudiced him because it prevented Mr. Allred from using that strike on juror 6 (who expressed bias) or on jurors 37 or 41 (who expressed hardship).

The State responds, in part, that jurors 6, 37, and 41 were impartial, and thus no constitutional error occurred. We consider each of the three jurors in turn.

### ii. Juror 6

Mr. Allred argues the trial court erred where it seated juror 6, who—Mr. Allred alleges—claimed he would vote to convict if Mr. Allred did not put on a defense. However, juror 6 later clarified he would vote to convict only if Mr. Allred did not put on a defense *and* the State had supplied proof beyond a reasonable doubt that Mr. Allred was guilty. We conclude that the seating of juror 6 did not deprive Mr. Allred of his right to an impartial jury.

### iii. Jurors 37 and 41

Mr. Allred argues that jurors 37 and 41 should not have been seated because they expressed a hardship. Both jurors expressed concerns about serving because they were needed at work. Such concerns favor neither the State nor the defendant. We conclude that the seating of jurors 37 and 41 did not deprive Mr. Allred of his constitutional right to an impartial jury.

We reject Mr. Allred's argument that he was deprived of his constitutional right to an impartial jury.

C.      EVIDENTIARY CHALLENGES

Mr. Allred assigns error where the trial court admitted evidence related to (1) gang affiliation, (2) voice identification, (3) handwriting analysis, and (4) telephone calls from jail.  We consider each argument separately.

*Standard of review*

This court reviews a trial court's decision to admit evidence for abuse of discretion.  *State v. Rice*, 48 Wn. App. 7, 11, 737 P.2d 726 (1987).  Where a trial court improperly admits evidence, the error is harmless unless the error materially affected the outcome of the trial.  *In re Welfare of X.T.*, 174 Wn. App. 733, 739, 300 P.3d 824 (2013).

1.      *Gang evidence*

Relevant evidence is generally admissible, except where the danger of unfair prejudice greatly outweighs its probative value.  ER 402, 403.  While a court may not admit evidence of other crimes, wrongs, or acts to prove the character of a person in order to show action in conformity therewith, it may admit such evidence to prove motive, intent, or plan.  ER 404(b).  Where used against a defendant, evidence of gang involvement falls within the scope of ER 404(b).  *State v. Yarbrough*, 151 Wn. App. 66, 81, 210 P.3d 1029 (2009).

21

Here, Mr. Allred argues the trial court erred by admitting generalized gang evidence where there was no nexus between the evidence and the crime charged. We disagree with this argument.

The trial court did not admit generalized gang evidence. Instead, it admitted evidence of *Mr. Cardenas's* gang involvement for the purpose of showing Mr. Allred's intent and plan in writing to Mr. Cardenas about harming Ms. Almaguer. Such evidence was proper. It was relevant to both attempt charges, as it showed intent and plan on the part of Mr. Allred to commit murder and arson—in a way that, say, a letter to a child or a clergy member would not. Because writing to a gang member to harm the State's witness was relevant to prove the "substantial step" component of attempt, it was properly admitted. RCW 9A.28.020(1).

### 2. *Voice identification*

Trial courts may admit testimony authenticating or identifying a voice on a recording where the declarant has heard the voice "at any time under circumstances connecting it with the alleged speaker." ER 901(b)(5).

Here, Mr. Allred argues the trial court should not have admitted Detective Brian McIlrath's identification of Mr. Allred's voice on the calls to Mr. Cardenas because (1) Detective McIlrath had only heard Mr. Allred's voice on one other occasion, and

(2) the State did not elicit any background information as to that one occasion on which the detective had heard Mr. Allred's voice.

As a preliminary matter, Mr. Allred concedes that he did not object to Detective McIlrath's identification at trial. Because an unpreserved claim of evidentiary error generally is not reviewable, we need not review this particular claim. RAP 2.5(a). We exercise our discretion to review it, simply because it will assist in our disposing of one of Mr. Allred's ineffective assistance of counsel claims, premised upon a failure to object to this evidence.

While Detective McIlrath's identification may have been thin or weak, it was admissible under ER 901(b)(5), which requires only that the declarant have heard the voice in question "at *any* time." (Emphasis added.) One time is any time. Moreover, the rule does not require the declarant to expound on the circumstances of the time or times on which he heard the voice previously, and Mr. Allred cites no case imposing this requirement. To the extent Mr. Allred considered this a deficiency in the detective's testimony, he could have pressed him about the matter on cross-examination.

But even if there was evidentiary error, it was harmless. The voice Detective McIlrath identified was speaking on a jail account registered to Mr. Allred. The voice purported to be Mr. Allred's not only identified one of Mr. Allred's addresses as his own, but explicitly identified himself as "Michael Navarro," which is Mr. Allred's legal name.

23

3.      *Handwriting analysis*

A witness may offer scientific, technical, or other specialized testimony where the testimony would assist the jury in discharging its duty and where the witness is qualified by knowledge, skill, experience, training, or education to offer the testimony in question. ER 702.

Here, Mr. Allred challenges the admission of handwriting expert Andrew Szymanski's testimony on the grounds that (1) the letters Mr. Szymanski analyzed were not signed, (2) the letters were not found in Mr. Allred's possession, (3) Mr. Szymanski did not utilize a handwriting exemplar, and (4) Mr. Szymanski never linked the letters to Mr. Allred.

As a preliminary matter, Mr. Allred did not object to Mr. Szymanski's testimony at trial. Similar to the prior issue, we need not review this unpreserved claim of error. But for the same reason as before, we exercise our discretion to review it.

As for Mr. Allred's first two arguments listed above, the letters in question were neither signed nor found in Mr. Allred's direct possession. But the lack of signature and possession does not preclude a handwriting expert from comparing writings and expressing an opinion as to whether they were written by the same person. This is precisely what handwriting experts do.

As for Mr. Allred's third argument, he cites no rule or decisional authority that requires a handwriting expert to work from an exemplar. While Mr. Allred cites *State v. DeCuir*, 19 Wn. App. 130, 135, 574 P.2d 397 (1978), as an instance where this court affirmed the admission of an exemplar, affirming an exemplar's admission is not tantamount to requiring one.

As for Mr. Allred's fourth argument, the State did not ask Mr. Szymanski to link the handwriting to any person. The State relied on other evidence to make this link. Specifically, the State argued that S.-Ex. 106 was written by Mr. Allred because the comparison letters were found in a car driven by Mr. Allred and because Mr. Allred referred to the letters he wrote to Mr. Cardenas when the two spoke by telephone.

### 4.      *Jail calls*

Mr. Allred argues that the use of jail calls by the State denied him his right to a fair trial under the Sixth and Fourteenth Amendments to the United States Constitution and under article I, sections 3 and 22 of the Washington Constitution. Mr. Allred further argues the evidence was unfairly prejudicial under ER 403. Mr. Allred obliquely refers to the State's witnesses who testified that numerous incarcerated gang members made jail telephone calls to the telephone number associated with Mr. Cardenas, and argues that this evidence did not have "any relevance to any element of any underlying offense(s)." Am. Br. of Appellant at 102. We disagree.

As previously noted, establishing that Mr. Cardenas was capable of violence was relevant—indeed highly relevant—to proving that Mr. Allred's letter to Mr. Cardenas constituted a substantial step toward burning down Ms. Almaguer's home or killing her. Admission of highly relevant evidence does not violate a defendant's right to a fair trial. Nor do we see how evidence of *Mr. Cardenas's* gang involvement unfairly prejudiced Mr. Allred. We reject Mr. Allred's constitutional fair trial and ER 403 challenges to this evidence.

D.      EVIDENTIARY SUFFICIENCY CHALLENGE

Mr. Allred challenges two of his first degree assault convictions and his two attempt convictions on sufficiency grounds. With respect to the assault convictions, he focuses on the doctrine of transferred intent. With respect to the attempt convictions, he focuses on the element of "substantial step." RCW 9A.28.020(1). As explained below, we disagree with his arguments and affirm those convictions.

*Standard of review*

Where a defendant challenges their conviction on the basis of insufficient evidence, the conviction will stand unless, viewing all evidence in the light most favorable to the State, no rational trier of fact could have properly convicted the defendant. *State v. Hampton*, 143 Wn.2d 789, 792, 24 P.3d 1035 (2001).

### 1.    First degree assault

A person commits assault when they put another in reasonable apprehension of harm. *State v. Wilson*, 125 Wn.2d 212, 218, 883 P.2d 320 (1994); *State v. Maurer*, 34 Wn. App. 573, 578-80, 663 P.2d 152 (1983). An assault is elevated to first degree if the accused intends to inflict great bodily harm by assaulting another with a firearm. RCW 9A.36.011(1)(a). Once first degree assault is established, "usually by proving that the defendant intended to inflict great bodily harm on a specific person, the mens rea is transferred under RCW 9A.36.011 to any unintended victim." *State v. Elmi*, 166 Wn.2d 209, 218, 207 P.3d 439 (2009).

Mr. Allred argues the State presented insufficient evidence to support a transferred intent theory to prove that Ms. Almaguer and Mr. Almaguer were assault victims. Mr. Allred argues (1) the State never established which person he intended to shoot, and (2) no witness testified that Ms. Almaguer or Mr. Almaguer were placed in reasonable apprehension of harm.

Mr. Allred's first contention is misguided. As noted in *Elmi*, transferred intent extends to any victim "once the intent to inflict great bodily harm is established." *Id.* Of course, the State may establish such intent by proving the defendant meant to shoot one specific person. However, where the defendant meant to shoot any of several people, the defendant still intended to inflict great bodily harm. Accordingly, transferred intent

applies even in the absence of proof that the defendant intended to harm a specific person.

Mr. Allred's second contention likewise is misguided. A jury may give circumstantial evidence as much weight as direct evidence. *State v. Slert*, 186 Wn.2d 869, 879, 383 P.3d 466 (2016). For this reason, it was not necessary for Ms. Almaguer or Mr. Almaguer to testify directly that they feared they would be harmed when Mr. Allred drew and fired the gun. Given the Almaguers' proximity to the other shooting victims, the jury could rationally have found that both Almaguers suffered reasonable apprehension of harm when Mr. Allred drew and fired his gun.

### 2. *Attempted first degree arson and attempted first degree murder*

A person attempts first degree arson when they undertake a substantial step toward causing a fire or explosion that damages a dwelling. RCW 9A.28.020(1); RCW 9A.48.020(1)(b). A person attempts first degree murder when they undertake a substantial step toward killing another. RCW 9A.28.020(1); RCW 9A.32.030(1). In either case, the "substantial step" in question must be "strongly corroborative of the actor's criminal purpose." *State v. Workman*, 90 Wn.2d 443, 452, 584 P.2d 382 (1978). Such corroboration exists where the defendant solicits another "'to engage in conduct constituting an element of the crime.'" *Id.* at 451 n.2 (internal quotation marks omitted) (quoting MODEL PENAL CODE § 501(2)(g) (Proposed Official Draft, 1962)).

Here, Mr. Allred argues the State lacked sufficient evidence to convict him of attempted first degree arson and attempted first degree murder because the letter he purportedly wrote to Mr. Cardenas was ambiguous. At most, Mr. Allred argues, the letter constituted "mere preparation," which does not constitute a substantial step. *Id.* at 449. We disagree.

While the letter does contain ambiguities, it can reasonably be read as saying: (1) Ms. Almaguer is cooperating with the prosecution, (2) shooting Ms. Almaguer and those she lives with would produce "[t]oo many bodies," (3) so burning Ms. Almaguer's house would be a good solution because multiple people often die in house fires, (4) or, someone could guarantee Ms. Almaguer's silence by shooting her. The letter additionally furnishes a means of executing arson or murder by providing (1) a map to Ms. Almaguer's house and (2) a means of physically identifying her. Viewing the evidence and all reasonable inferences in the State's favor, a rational jury could have found that the letter strongly corroborated Mr. Allred's criminal purposes of first degree arson and first degree murder.

> 3. *Witness tampering*

Mr. Allred argues the State presented insufficient evidence to sustain his witness tampering charge. We agree.

A person commits witness tampering where they attempt to "induce a witness" to withhold testimony or be absent from an official proceeding. RCW 9A.72.120(1)(a), (b). "Induce" means to influence or persuade. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1154 (1993). Here, there was evidence that Mr. Allred attempted to harm Ms. Almaguer, but no evidence that Mr. Allred attempted to influence Ms. Almaguer's decision-making or shape her actions relative to the testimony she would provide.

The State, citing *State v. Williamson*, 131 Wn. App. 1, 6-7, 86 P.3d 1221 (2004), correctly argues that witness tampering does not require actual contact with the witness. The State then cites *State v. Sanders*, 66 Wn. App. 878, 833 P.2d 452 (1992), to support its sufficiency argument.

In *Sanders*, the defendant instructed his wife, during jail telephone calls and visits, to tell the witness (his stepdaughter) to "'stop saying that.'" *Id.* at 882. Later, released while pending trial, the defendant paid for his family to leave town and saw them off as they boarded a bus for Palm Springs, California. *Id.* at 881. *Sanders* is distinguishable. There, the defendant indirectly influenced his stepdaughter to withhold testimony and later attempted to persuade her to be absent from trial by paying to send her far away.

Although remand is required to vacate the witness tampering conviction, resentencing is not required. This is because the trial court considered the second set of charges as the same criminal conduct and did not add any points to Mr. Allred's offender

30

score as a consequence of his witness tampering conviction. *See State v. Kilgore*, 167 Wn.2d 28, 216 P.3d 393 (2009) (resentencing necessary when reduced offender score affects sentencing range).

E.      FIFTH AMENDMENT EXPLOITATION CLAIM

Mr. Allred argues the prosecution improperly called Jose Cardenas to testify where the State knew Mr. Cardenas would invoke Fifth Amendment protections. Mr. Allred argues this strategy invited the jury to draw impermissible inferences about Mr. Allred from Mr. Cardenas's assertion of his Fifth Amendment privilege. We disagree. Mr. Cardenas never asserted his Fifth Amendment privilege.

A prosecutor who knows a witness will invoke their Fifth Amendment privilege against self-incrimination may not stridently question that witness on privileged matters for the purpose of inviting inferences adverse to the defendant. *State v. Nelson*, 72 Wn.2d 269, 283, 432 P.2d 857 (1967). However, reversible error does not arise simply because a witness invokes their Fifth Amendment privilege. *Id.* at 279. Instead, reversible error lies only where the State engages in "'planned or deliberate attempts . . . to make capital out of [a witness's] refusal[ ] to testify.'" *Id.* at 280 (quoting *Namet v. United States*, 373 U.S. 179, 189, 83 S. Ct. 1151, 10 L. Ed. 2d 278 (1963)).

Here, the State did not exploit Mr. Cardenas's invocation of Fifth Amendment protections because Mr. Cardenas did not even invoke Fifth Amendment protections.

31

Instead, Mr. Cardenas simply cooperated with one question—he agreed to spell his name—before refusing to answer three insignificant questions related to (1) his home address, (2) his telephone number, and (3) whether he knew Mr. Allred.

Not only did Mr. Cardenas never invoke his Fifth Amendment privilege, he never encountered a question that could have triggered Fifth Amendment protections. After all, a witness may invoke the Fifth Amendment only where the answer they would give to a discrete question would incriminate them. *Fam. of Butts v. Constantine*, 198 Wn.2d 27, 63-64, 491 P.3d 132 (2021). They may not invoke the privilege in a blanket fashion against all posed questions. *Id.* Here, the questions asked by the State would not have allowed Mr. Cardenas to invoke his Fifth Amendment protection because he did not face criminal exposure for stating his home address, his telephone number, or whether he knew Mr. Allred.

Moreover, the State did not "'make capital'" out of Mr. Cardenas's refusal to answer. *Nelson*, 72 Wn.2d at 280 (quoting *Namet*, 373 U.S. at 189). Instead, when it became apparent Mr. Cardenas would not cooperate, the State excused him as a witness. The *Nelson* court expressly endorsed the State's approach in this respect, where it approved of a prosecutor's decision to discontinue questioning once it became apparent the witness would not answer questions. *Id.* at 282.

F.       I<small>NEFFECTIVE</small> A<small>SSISTANCE OF</small> C<small>OUNSEL</small>

Mr. Allred argues he received ineffective assistance of counsel at trial. We disagree.

Under the Sixth Amendment, a criminal defendant has the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 685-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To establish ineffective assistance of counsel, a defendant must prove both that:

> (1) [D]efense counsel's representation was deficient, *i.e.*, it fell below an objective standard of reasonableness based on consideration of all the circumstances; and (2) defense counsel's deficient representation prejudiced the defendant, *i.e.*, there is a reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different.

*State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995) (citing *State v. Thomas*, 109 Wn.2d 222, 225-26, 743 P.2d 816 (1987)). Where counsel makes legitimate tactical decisions, those decisions will not support an ineffective assistance claim even where other counsel may have made other decisions. *See State v. Prado*, 144 Wn. App. 227, 248, 181 P.3d 901 (2008).

Here, Mr. Allred alleges three deficiencies on the part of his trial counsel—failure to object to Detective McIlrath's voice identification, failure to object to Mr. Szymanski's handwriting analysis, and failure to request a limiting instruction about gang evidence.

As to the first two alleged deficiencies, we have previously concluded that the trial court did not abuse its discretion when admitting this opinion evidence. It is not ineffective assistance where counsel fails to object to admissible evidence.

As to the third alleged deficiency, Mr. Allred's counsel justifiably declined a limiting instruction as to gang evidence where such an instruction might have reinforced for the jury the possibility of Mr. Allred himself having gang ties. As Mr. Allred's counsel explained to the trial court, "there's been so little testimony regarding gangs I don't . . . want the instruction because I don't want to put undue emphasis on that point on that evidence." 8 RP at 805. This was a legitimate tactical decision, which under *Prado* cannot support an ineffective assistance claim. 144 Wn. App. at 248.

G.    SENTENCING CHALLENGES

Mr. Allred argues the trial court erred where it (1) found him indigent but nevertheless burdened him with a $600 court-appointed attorney fee, (2) imposed a no-contact order in favor of Rafael Almaguer, who was deceased when the court imposed the order, and (3) imposed a sentence of 1,066-months in violation of article I, section 14 of the Washington Constitution, and in contravention of Washington's Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW.

The State correctly concedes the first two arguments, and, without analysis, we remand for the trial court to strike the $600 court-appointed attorney fee, and to vacate

34

the no-contact order in favor of Rafael Almaguer.  However, as explained below, we

disagree with Mr. Allred's third argument.

*Standard of review*

Where an appellant challenges their sentence on constitutional grounds, we review

that challenge de novo.  *State v. Grenning*, 142 Wn. App. 518, 544, 174 P.3d 706 (2008),

*aff'd*, 169 Wn.2d 47, 234 P.3d 169 (2010).

*Constitutional sentencing*

Generally, a defendant may appeal a standard range sentence only on

constitutional grounds.  RCW 9.94A.585; *State v. McNeair*, 88 Wn. App. 331, 336, 944

P.2d 1099 (1997).  The Washington Constitution forbids "cruel punishment."  CONST.

art. I, § 14.  A punishment is cruel where it is disproportionate to the underlying offense.

*State v. Moretti*, 193 Wn.2d 809, 830, 446 P.3d 609 (2019).  To assess proportionality,

Washington courts evaluate four factors:

> (1) the nature of the offense; (2) the legislative purpose behind the
> [sentencing] statute; (3) the punishment [the] defendant would have
> received in other jurisdictions for the same offense; and (4) the punishment
> meted out for other offenses in the same jurisdiction.

*State v. Fain*, 94 Wn.2d 387, 397, 617 P.2d 720 (1980).

Here, Mr. Allred concedes the *Fain* standard but analyzes only the second of the four factors.  Under our own analysis of the factors, we conclude that Mr. Allred's sentence, while severe, was not disproportionate.

### i. *Nature of offense*

The eight offenses we have upheld all evince a disregard for human life.  As to counts 1-4, Mr. Allred drew a weapon and fired it into a gathering of people, nearly killing one, and risking the lives of three others.  While awaiting trial on that conduct, Mr. Allred confirmed his disregard for human life by soliciting a gang member to kill or burn down the house of the State's star witness.

The first *Fain* factor supports a very lengthy sentence.

### ii. *Legislative purpose*

The purpose of the Sentencing Reform Act is

to make the criminal justice system accountable to the public by developing a system for the sentencing of felony offenders which structures, but does not eliminate, discretionary decisions affecting sentences, and to:
(1)  Ensure that the punishment for a criminal offense is proportionate to the seriousness of the offense and the offender's criminal history;
(2)  Promote respect for the law by providing punishment which is just;
(3)  Be commensurate with the punishment imposed on others committing similar offenses;
(4)  Protect the public;
(5)  Offer the offender an opportunity to improve him or herself;

36

(6)  Make frugal use of the [S]tate's and local governments' resources; and

(7)  Reduce the risk of reoffending by offenders in the community.

Former RCW 9.94A.010 (1999).

Here, Mr. Allred's sentence honors provisions (1) and (3) because it is a standard range sentence, based on a correct offender score.  The sentence honors provision (2) because it punishes Mr. Allred's attempt to circumvent just punishment by murdering a witness against him.  The sentence honors provision (4) because it protects the public from a defendant who has consistently shown disdain for human life.

Mr. Allred's sentence does not allow him to reenter society.  While that condition serves the purpose of provision (7) by protecting society from someone with a lengthy and serious criminal history, provision (5) is honored only in the limited sense that Mr. Allred can improve himself by enrolling in programming available to inmates.

The sentence does not honor provision (6), inasmuch as lengthy incarceration is costly.  However, the State in this instance is not squandering resources by confining an inmate who does not threaten the public.  On the contrary, Mr. Allred has shown a lack of remorse and a willingness to continue threatening the lives of others.

The second *Fain* factor largely supports a very lengthy sentence.

### iii.  Foreign sentencing standards

Mr. Allred cites no jurisdictions where the sentencing guidelines for his offenses differ from the guidelines in Washington.  Our court declines to conduct a comprehensive cross-jurisdictional analysis of this matter where Mr. Allred himself did not see fit to. *See City of Seattle v. Muldrew*, 69 Wn.2d 877, 877, 420 P.2d 702 (1966) ("Where no authorities are cited in support of a proposition, [our] court is not required to search for authorities, but may assume that counsel, after diligent efforts, has found none."). Nevertheless, we note that a majority of American jurisdictions authorize—or require— habitual offender sentences where the defendant has committed multiple felonies.[6]  While the court below did not sentence Mr. Allred under our habitual offender statute, the comparison nonetheless is apt.  As of this verdict, Mr. Allred has accumulated over a dozen felony convictions, the preponderance of which were violent.  In any number of American jurisdictions, Mr. Allred would face an actual or constructive life sentence.

The third *Fain* factor favors a very lengthy sentence.

### iv.  Punishment for other offenses

The SRA ranks crimes according to severity and then imposes sentence ranges accordingly.  RCW 9.94A.515, .510.  The SRA assigns first degree assault a seriousness

---

[6] For an overview of habitual offender statutes, along with cases addressing such statutes in various jurisdictions, see 24 C.J.S. *Criminal Procedure and Rights of Accused* § 2438 (2016), and 16B C.J.S. *Constitutional Law* § 1355 (2015).

level of XII out of XVI, which ranks it below intentional homicide crimes, terroristic crimes involving explosives, and human trafficking.  RCW 9.94A.515.  This is appropriate, given that most of these more serious crimes involve the intentional killing of others, whereas first degree assault entails only a willingness to endanger the lives of others.

Ranking below first degree assault are crimes that threaten human life without malicious intent—such as manslaughter—as well as crimes that threaten human safety but not human life, and crimes that threaten property.  RCW 9.94A.515.  Appropriately, these crimes draw less severe punishment than first degree assault.

First degree arson is a property crime, drawing a severity ranking of VIII. RCW 9.94A.515.  Unlawful possession of a firearm and felony harassment have a seriousness level of III.

Finally, the SRA punishes criminal attempt by reducing the sentence by 25 percent from the corresponding completed crime.  RCW 9.94A.595.  In this way, the punishment scale for criminal attempt ties itself to the scale for completed crimes, and mirrors the latter scale's severity hierarchy.

Considering our sentencing scheme as a whole, the punishment meted out for Mr. Allred's eight affirmed convictions is consistent when compared to greater and lesser

offenses in Washington. We conclude that the fourth *Fain* factor supports Mr. Allred's very lengthy sentence.

### v. Conclusion

Having analyzed the sentence imposed on Mr. Allred under the four *Fain* factors, we determine that Mr. Allred's very lengthy sentence does not violate our State's constitutional prohibition against cruel punishments.

### CONCLUSION

We remand to vacate Mr. Allred's witness tampering conviction, but affirm his other convictions. We direct the trial court to strike the court-appointed attorney fee assessed against Mr. Allred, and to vacate the no-contact order against an assault victim who died before trial. Because vacating the witness tampering conviction will not decrease Mr. Allred's offender score, resentencing is not required.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Lawrence-Berrey, C.J.

WE CONCUR:

Staab, J.

Cooney, J.

40